UNITED STATES of America, Plaintiff,

and

Inupiat Community of the Arctic Slope, Plaintiff-Intervenor-Appellant,

v.

ATLANTIC RICHFIELD COMPANY et al., Defendants-Appellees.

United States of America, Plaintiff-Appellant,

and

INUPIAT COMMUNITY OF THE ARCTIC SLOPE, Plaintiff-Intervenor,

v.

ATLANTIC RICHFIELD COMPANY et al., Defendants-Appellees.

Nos. 77–3234, 77–3972.

United States Court of Appeals, Ninth Circuit.

Jan. 4, 1980.

Rehearing Denied Feb. 22, 1980.

---

**25.** The award of $10,000 in attorneys' fees here no doubt provides additional deterrence to would-be infringers.

Dirk D. Snel, Washington, D. C., for plaintiff-intervenor-appellant.

Richard O. Gantz, Anchorage, Alaska, Avrum M. Gross, Juneau, Alaska, argued for defendants-appellees; Robert L. Hartig, Joseph Rudd, Eugene F. Wiles, Anchorage, Alaska, William B. Rozell, Juneau, Alaska, on the brief.

Before CHOY and KENNEDY, Circuit Judges, and WILLIAMS,* District Judge.

CHOY, Circuit Judge:

Appellants protest the ruling of the district court that their trespass claims were extinguished by the Alaska Native Claims Settlement Act. We affirm.

## I. BACKGROUND

Appellants[1] represent all the Eskimos on the North Slope of Alaska. Appellees are

---

1. Appellants are the United States and the Inupiat Community of the Arctic Slope. The Inupiat Community is composed of all the Eskimos on the North Slope. In *Edwardsen v. Morton,* 369 F.Supp. 1359 (D.D.C.1973), essentially a suit by the Inupiats against the United States, a claim that the United States breached its fiduci-

ary duty by authorizing the trespasses involved here survived summary judgment. The United States settled the *Edwardsen* suit by agreeing to sue the defendants here on behalf of the Inupiats. This suit resulted, and the Inupiats intervened.

This opinion will refer generally to all the Eskimos and Indians inhabiting Alaska as "Natives," and specifically to the Eskimos inhabiting the North Slope as "Inupiats."

the State of Alaska[2] and companies involved in the effort to exploit North Slope petroleum. Until one or two decades ago the North Slope was essentially unpeopled except for a few Inupiates[3]; more recently, there has been a mighty "oil rush." For the purposes of this appeal, we assume that the Inupiats retained unrecognized aboriginal title to the North Slope until 1971. Such title is good against third parties (we assume *arguendo*) but can be extinguished without compensation by the United States. *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955).

Pursuant to the Alaska Statehood Act, § 6, the state selected a large amount of oil-rich "vacant, unappropriated, and unreserved" North Slope land for its own in the 1960's. The United States tentatively approved these selections, and the state gave conditional leases to oil interests in exchange for $912,000,000. Most of the alleged trespasses were under this color of state title. We assume *arguendo* that, because of the Inupiats' aboriginal title, the selections and leases were invalid and the entries were trespasses. *Cf. Alaska v. Udall*, 420 F.2d 938 (9th Cir. 1969) (aboriginal rights might prevent state selection), *cert. denied*, 397 U.S. 1076, 90 S.Ct. 1522, 25 L.Ed.2d 811 (1970). On petition of the Natives, Congress enacted the Alaska Native Claims Settlement Act, Pub.L. No. 92–203, 85 Stat. 688 (codified at 43 U.S.C. § 1601 *et seq.*) ("the Act") on December 18, 1971. Congress found and declared that "there is an immediate need for a fair and just settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims," and that "the settlement should be accomplished rapidly, with certainty, in conformity with the real economic and social needs of Natives, without litigation." 43 U.S.C. § 1601(a), (b).

Appellants instituted this suit against the private defendants for pre-Act trespasses in the belief that the Act had not extinguished such claims. This belief found support in *Edwardsen v. Morton*, 369 F.Supp. 1359 (D.D.C.1973), but the district court in the present case disagreed and dismissed the claims. 435 F.Supp. 1009 (D.Alaska 1977).[4]

We hold that the Act extinguished not only the aboriginal titles of all Alaska Natives, but also every claim "based on" aboriginal title in the sense that the past or present existence of aboriginal title is an element of the claim.[5] In exchange, the Natives were granted $962,500,000 and 40,000,000 acres of land in fee simple.

## II. STATUTORY LANGUAGE

This case requires a construction of § 4 of the Act, 43 U.S.C. § 1603, which reads:

(a) All prior conveyances of public land and water areas in Alaska, or any interest therein, pursuant to Federal law, and all tentative approvals pursuant to section 6(g) of the Alaska Statehood Act, shall be regarded as an extinguishment of the aboriginal title thereto, if any.

(b) All aboriginal titles, if any, and claims of aboriginal title in Alaska based on use and occupancy, including submerged land underneath all water areas, both inland and offshore, and including any aboriginal hunting or fishing rights that may exist, are hereby extinguished.

(c) All claims against the United States, the State, and all other persons that are based on claims of aboriginal right, title, use, or occupancy of land or water areas in Alaska, or that are based on any statute or treaty of the United States relating to Native use and occupancy, or that are based on the laws of

---

2. The State has a good sovereign-immunity defense.

3. The North Slope comprises 56,500,000 acres. According to the 1970 census, only 3500 people inhabited the entire area, and not all of these were Eskimos. Over 2000 lived in Barrow, and all but 124 lived in one or another of eight widely separated villages.

4. For a more complete exposition of the background of this case, *see id.* at 1013–19.

5. But claims not based on aboriginal title—for example, personal injury claims, claims for damage to personal property, and claims for trespass to land held in fee—were not extinguished.

any other nation, including any such claims that are pending before any Federal or state court or the Indian Claims Commission, are hereby extinguished.

The parties agree, and so do we, that § 4(b) extinguished all aboriginal titles as of December 18, 1971, the date the Act was enacted.

### A. Section 4(a)

There is disagreement over § 4(a). Appellees argue that it is retroactive, extinguishing aboriginal titles as of the dates of the prior conveyances and tentative approvals of state selections. Appellants read the subsection as being prospective only, so that in post-1971 proceedings the conveyances and selections (and leases thereunder) should be regarded (through legal legerdemain) as unclouded and valid today even if they were invalid when made.[6] Appellants claim that their aboriginal title was not truly extinguished, however, until 1971. If the Inupiats' aboriginal title was not extinguished until 1971, they arguably have a good cause of action for pre-1971 trespasses; whereas if at the times of entry the oil companies held valid leases from the holders of the valid fee, the entries were not trespassory.

The district court held that § 4(a) was retroactive, and thus that the entries under federal authorization and the conditional state leases (the bulk of all the entries) were not trespasses. 435 F.Supp. at 1022–25. We agree. Both § 4(b) and § 4(c) say that Native interests are "hereby" extinguished; § 4(a) does not, suggesting that it extinguished title as of some past moment. We deem the retroactive interpretation of § 4(a) to be more logical, whereas the prospective interpretation creates a cumbersome legal fiction whose only apparent purpose is to preserve Native trespass claims which (as we hold herein) were immediately extinguished in § 4(c).

If § 4(a) accomplished anything that § 4(b) and § 4(c) did not, it was to validate the state oil leases (as between the state and its lessees) by establishing that the state had good title to lease out. A retroactive reading serves this purpose directly and well; a prospective reading conspicuously fails actually to validate the leases, but instead directs the courts to regard the leases as if they were valid. Between these two readings, the retroactive one is obviously more reasonable.

### B. Section 4(c)

Section 4(a), as we read it, had the effect of eliminating most of appellants' trespass claims. We further hold that § 4(c) specifically extinguished all trespass claims.

Without doubt, § 4(c) abolished all Native claims based on the actual "taking" (extinguishment) of aboriginal title. The question presented on appeal is whether or not the district court was correct to say that § 4(c) went farther and extinguished "all claims . . . that are based on . . . aboriginal right" in the sense that the past or present existence of aboriginal title is an element of the claims.

Several passages in the subsection clearly indicate that Congress intended to extinguish more types of claims than merely claims for the "taking" (extinguishment) of aboriginal title. Therefore, we conclude that the district court was correct.

The subsection reads, "All claims against the United States, the State, and all other persons that are based on claims of aboriginal right . . . are hereby extinguished." Since only the United States could extinguish the Natives' aboriginal title, only the United States could be the defendant in a suit based on extinguishment of title. Yet all claims against "the State, and all other persons" were extinguished as well. In order to make the language regarding "the State, and all other persons" meaningful, there is no choice

---

**6.** The Inupiats' argument is that § 4(a), "by ratifying pre-ANCSA federal conveyances, was intended to, and did, give good present title to parties whose land titles would otherwise have been void even after the general extinguishment of aboriginal title in Alaska effected by subsection 4(b)."

but to construe the statute to extinguish certain types of claims, "based on aboriginal right," that might be brought against the State and other persons. The quintessential action against private citizens, based on aboriginal title, is an action for wrongful invasion, use, and assertion of dominion over the property—trespass.

Moreover, such trespass claims might be brought by Natives in "state court," as § 4(c) contemplated, while claims against the United States for extinguishment of title could only be brought in federal court. Further, at the time the Act's language was drafted, no claim based on extinguishment of title was "pending" in any court, yet Congress extinguished all pending claims. Congress must have had in mind claims based on pre-1971 activities.

In short, when Congress said in §§ 2(a) and 4(c) of the Act, 43 U.S.C. §§ 1601(a), 1603(c), that it was settling "all claims," it meant just that. Congress intended to and did extinguish all Native trespass claims based on aboriginal title.

### III.  LEGISLATIVE HISTORY

To be sure, the strict "plain meaning rule" has been relaxed, and we may examine legislative history to help us construe even seemingly clear statutory language. *Doyon, Ltd. v. Bristol Bay Native Corp.*, 569 F.2d 491, 494 (9th Cir.), *cert. denied*, 439 U.S. 954, 99 S.Ct. 352, 58 L.Ed.2d 345 (1978). Such examination, however, does not alter our reading of § 4(c). The House report stated,

Section 4 extinguishes all aboriginal titles in Alaska, and all claims based thereon,

and

The section extinguishing aboriginal titles and claims based on aboriginal title is intended to be applied broadly, and to bar any further litigation based on such claims of title.

H.R.Rep. No. 523, 92d Cong., 1st Sess. 6, 8, *reprinted in* [1971] U.S.Code Cong. & Ad.

News 2196, 2198. The Senate report stated that the objective of the legislation was to avoid

a myriad of lawsuits which cannot provide justice to any of the parties involved but which may be expected to increase the existing antagonisms between Native people and other Alaskans.

S.Rep. No. 405, 92d Cong., 1st Sess. 73 (1971). The Conference Committee report [7] stated,

It is the clear and direct intent of the conference committee to extinguish *all* aboriginal claims and *all* aboriginal land titles, if any, of the Native people of Alaska and the language of settlement is to be broadly construed to eliminate such claims and titles as any basis for any form of direct or indirect challenge to land in Alaska.

Conf.Rep. 40, *reprinted in* [1971] U.S.Code Cong. & Ad.News 2253 (emphasis in original).

The statements of former Justice Arthur Goldberg, attorney for the Alaska Federation of Natives, before Congress in 1969 also support the district court's conclusion. Goldberg, under questioning by Senator Stevens of Alaska, said, "The position that the Natives have taken is that they are prepared for an extinguishment of anything that is based upon aboriginal title." *Alaska Native Land Claims: Hearings on S. 1830 Before the Senate Comm. on Interior and Insular Affairs*, 91st Cong., 1st Sess. 300–01 (1969). And Goldberg painstakingly informed Congressman Pollock of Alaska that the Natives would be unable to assert claims against private parties for pre-extinguishment trespasses, and that he said this just after conferring about it "with all of the Native representatives who are here and all their regional counsel." *Alaska Native Land Claims: Hearings on H.R. 13142 and 10193 Before the Subcomm. on Indian Affairs of the House Comm. on Interior and Insular Affairs*, 91st Cong., 1st Sess. 267 (1969). While these statements do not es-

---

**7.** The House and Senate Conference Reports are identical. S.Conf.Rep. No. 581, 92d Cong., 1st Sess. (1971); H.R.Conf.Rep. No. 746, 92d Cong., 1st Sess. (1971). [Hereinafter cited as Conf.Rep.]

top the Inupiats or other Natives, they do suggest what Congress meant by the language it enacted into law.

Indeed, in view of the repeated statements in the legislative history that the statute should be "broadly" applied to extinguish "all claims," and in view of Congress' knowledge of the Natives' trespass claims, it would be incomprehensible to us if Congress did not intend to extinguish the trespass claims, along with all other claims based on aboriginal title, when it gave the Natives over 60,000 square miles of fee simple land and almost a billion dollars.[8]

The Inupiats' only support from the legislative history is the following passage from S.Rep. No. 405, 92d Cong., 1st Sess. 110–11 (1971):

> Subsection 4(a) [§ 4(c) of the Act as passed] declares that the provisions of this Act constitute a full and final extinguishment of any and all claims based upon aboriginal right, title, use or occupancy of land in Alaska. The language specifically includes submerged lands and any aboriginal hunting and fishing rights. The extinguishment is final and effective not only for claims against the United States but also for any claims against the State of Alaska and all other persons. Remaining in effect and unextinguished by this Act are all claims which are based upon grounds other than the loss of original Indian title land. Included in such unextinguished claims are suits for an accounting for funds belonging to Natives or Native groups in the custody of the United States, for tort or breach of contract, and for violations of the fair and honorable dealings clause of the Indian Claims Commission Act. Specifically included, and dismissed and extinguished under the terms of this Act, are all claims pending before the Indian Claims Commission and any court, Federal or State, which are based upon a claim of aboriginal right, title, use or occupancy.

However, this language does not persuade us that Congress, or even the Senate, meant to preserve the Natives' trespass claims, for the following reasons:

(1) True, the report language preserves suits "for tort," and trespass is a tort. However, we think that the Senate's meaning, as indicated by the three other kinds of action it specifically preserved and by the legislative history generally, was that all kinds of civil action were preserved if they were not based in any way on aboriginal title. Thus, such "tort" actions as those based on personal injury or damage to personal property would not be extinguished. The passage is no better than ambiguous on the issue of whether or not trespass actions based on aboriginal title were to be preserved.

(2) The report language preserves "all claims which are based upon grounds other than the loss of original Indian title land." But appellees correctly point out that this paragraph from the 1971 Senate report is identical to the corresponding paragraph in S.Rep. No. 925, 91st Cong., 1st Sess. 114 (1970), a report on an earlier bill that never became law. Yet there was a major difference between S. 35 (1971) and S. 1830 (1970). The following is the language of S. 35, with words added to S. 1830's language in italics and words deleted from it in brackets:

> The provisions of this Act shall constitute a full and final settlement and extinguishment of any and all claims against the United States, the State and all other persons which are based on aboriginal right, title, use, or occupancy of land in Alaska . . ., including all [land] claims [(but not claims based on grounds other than loss of original Indian title land)] *based upon original right, title, use or occupancy* pending before any court or

---

**8.** Congress was aware that under *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955), it was not obligated to give the Natives any compensation at all for the taking of aboriginal title. While Congress, as a matter of grace, surely intended a substantial part of the large settlement to be in exchange for the taking of title, we cannot but wonder if the settlement would have been so large if Congress did not believe it was also taking something for which it had to pay.

**1138**

the Indian Claims Commission on the effective date of this Act.

The fact that the 1971 report said it was preserving claims based on "grounds other than loss of original Indian title land," when precisely that language had just been excised from the 1971 Senate bill, persuades us that the district court was correct in concluding that the verbatim carryover of the 1970 Senate report language into the 1971 Senate report was just a hasty mistake.

(3) The Inupiats claim that the 1971 change in the language of the Senate bill made and was meant to make no substantive change. The chronology of the change suggests otherwise, *see* 435 F.Supp. at 1028. At any rate, the very fact that the language of the Senate bill *was* changed, and from language that preserved the trespass claims to language that at the very best was ambiguous about the trespass claims, undermines the Inupiats' contention. They have advanced no reason why this change was made. In these circumstances, we are inclined to credit the post-Act testimony of Senator Stevens of Alaska, who said that the filing of the trespass-based *Edwardsen v. Morton* and the reporting of the House bill's broader extinguishment clause "caused us in the Senate to reconsider the language of our extinguishment provision, and we concluded that it should be broadened so as to leave no doubt that the settlement would be total . . . ." *Alaska Native Claims Settlement Act Amendments: Hearings on H.R. 6644 Before the Subcomm. on Indian Affairs of the House Comm. on Interior and Insular Affairs*, 94th Cong., 1st Sess. 110 (1975), *quoted in* 435 F.Supp. at 1028 n.59. We conclude that, whether or not in 1970 the Senate wanted to preserve Native trespass claims, in 1971 it intended to and did vote to extinguish them.

(4) Even in the absence of the foregoing, a strict reading of the 1970 Senate bill's language would compel the conclusion that the only trespass claims preserved by the parenthetical "(but not claims based on grounds other than loss of original Indian title land)" would be those "pending" before a court or agency on the Act's effective date. Since no Inupiat suit against the private defendants was pending on that date, we would have to hold the claims in this case extinguished even if the 1970 Senate bill (or its spirit) were the governing law.

(5) Finally, whatever the Senate bill and report entailed, it was the *House* version of § 4 that emerged victorious in the Conference Committee and was then approved by both houses. The Conference bill followed the House bill almost word-for-word, omitting only two words and adding a few phrases not material here. The organization of the Senate bill was substantially different. True, the conference report stated, "The conference report language is, in substance, the same as the language of the Senate amendment." Conf.Rep. 40, *reprinted in* [1971] U.S.Code Cong. & Ad. News 2253. However, this sentence was immediately followed by language quoted above to the effect that "*all* aboriginal claims" were extinguished, and that "the language of settlement is to be broadly construed to eliminate such claims," and was included in a section entitled "Major Differences Between the Conference Report and the Senate's Amendment in the Nature of a Substitute to the House Passed Bill." Thus it is clear that the conference bill followed the intent of the House. When it was said that its language was "in substance, the same as the language of the Senate amendment," this signified only that the conferees also interpreted the Senate's language to extinguish Native trespass claims.

In sum, nothing in the Senate report or the other legislative history convinces us that Congress really meant, in the teeth of the statutory language, to preserve the trespass claims asserted in this case.

## IV. RULES OF CONSTRUCTION

■ The Inupiats also advance several arguments based upon rules of statutory construction. It is true that in cases of ambiguity statutes are to be construed (1)

in favor of Indians; (2) to avoid constitutional questions; (3) to avoid taking vested rights; and (4) non-retroactively. However, these are only guidelines, not substantive laws, and should not be used to defeat the manifest intent of Congress. It cannot be doubted that Congress has power to pass a law that violates the spirit of all four of these rules, and we should not deny effect to such a law when it is enacted. Moreover, both the Conference and House reports direct, as we point out above, that § 4 be construed "broadly" to extinguish all claims and litigation, and this takes precedence over generalized rules of construction.

We add the following comments. The rule of construction of ambiguous statutes in favor of Indians is based on a concern that the powerful not take advantage of the helpless and uneducated. A similar concern guides modern law on the construction of contracts of adhesion. Where, as here, the Inupiats were represented before Congress by such illustrious counsel as former Supreme Court Justice Arthur Goldberg and former Attorney General Ramsey Clark, we think the rule of construction operates with less force.

We also find the rule to construe statutes to avoid constitutional questions to be less compelling than the rule, not implicated here, to construe statutes so as not to be forced to hold them unconstitutional. The constitutional question we are asked to obviate is whether or not under the Fifth Amendment compensation must be paid for taking the Inupiats' trespass claims. Our holding here clears the way for this question to be addressed in some other forum, but we express no opinion on what the answer should be.

Although we recognize the rules of construction regarding takings and retroactivity, we find that Congress has sufficiently clearly expressed its intent in these areas.

### V. ISSUES NOT REACHED

Our disposition of this case makes it unnecessary for us to decide (1) whether or not the Inupiats ever had or retained aboriginal title to all the land they claimed;

(2) whether or not the aboriginal title had already been extinguished before the Act and before the trespasses alleged here; (3) whether or not Congress gave just compensation for the package of various Native properties and interests it took and extinguished by giving the Natives 40 million acres of land and nearly a billion dollars; and (4) whether or not any Fifth Amendment compensation is required at all for the Native properties and interests taken and extinguished by the United States. Perhaps these questions will be decided in *Inupiat Community of the Arctic Slope v. United States*, No. 77–596 (Ct.Cl., filed Dec. 16, 1977). We note that if they are decided favorably to the Inupiats there, the Inupiats might recover as just compensation from the United States the same amount that they could have recovered from the trespassing private defendants in the absence of the Act.

AFFIRMED.