## INUPIAT COMMUNITY OF the ARCTIC SLOPE

v.

## The UNITED STATES.

### No. 596–77.

United States Court of Claims.

June 2, 1982.

Charles A. Goldmark, Seattle, Wash., attorney of record, for plaintiff; David C. Crosby, William H. Block, Wickwire, Lewis, Goldmark & Schorr, Seattle, Wash., Harry R. Sachse, Sonosky, Chambers & Sachse, Washington, D.C., and Gregory O'Leary, Seattle, Wash., of counsel.

Glen R. Goodsell, with whom was Asst. Atty. Gen., Carol E. Dinkins, Washington, D.C., for defendant.

Before FRIEDMAN, Chief Judge, and KUNZIG[*] and BENNETT, Judges.

[*] Before his death, Judge Kunzig participated in the oral argument and agreed with the disposi-

ON DEFENDANT'S MOTION TO DISMISS AND PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

FRIEDMAN, Chief Judge:

The Inupiat Community is a recognized tribe of Eskimos inhabiting the Arctic or North Slope of Alaska. The Alaska Native Claims Settlement Act, 43 U.S.C. §§ 1601–1628 (1976 & Supp. III 1979) ("Settlement Act"), extinguished the Eskimos' interest in that land. *United States v. Atlantic Richfield Co.*, 612 F.2d 1132, 1135–38 (9th Cir.), *cert. denied*, 449 U.S. 888, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980), discussed below, held that the Settlement Act also extinguished the Eskimos' claims for trespasses of other persons upon those lands that occurred prior to the Settlement Act.

This suit seeks just compensation for the alleged taking by the United States through the Settlement Act of two categories of claims of the Eskimos that arose prior to the Act and that the Act extinguished: (1) claims based upon trespasses by third parties to the land; (2) claims against the United States for various alleged breaches of the government's fiduciary duties to the Eskimos, and the alleged denial by the United States of due process to the Eskimos. The defendant has moved to dismiss and the plaintiff has moved for partial summary judgment on liability. We heard oral argument. We hold for the defendant and dismiss the petition.

I.

The Arctic Slope is an area of 56.5 million acres " 'between the summit line of the Brooks Mountain Range and the shore of the Arctic Ocean, from north to south, and from the Canadian Border to Point Hope, from east to west.' " *Edwardsen v. Morton*, 369 F.Supp. 1359, 1363 n.1 (D.D.C.1973), *dismissed as moot*, No. 2014–71 (February 16, 1977) (citation omitted). The Slope includes Prudhoe Bay, the site of extensive oil pro-

tion of this case.

duction in Alaska today. Prior to the Settlement Act, the Inupiats claimed Indian or aboriginal title to this land.

The treaty of cession of Alaska in 1867 conferred full rights of citizenship upon Alaskans "with the exception of uncivilized native tribes.... The uncivilized tribes will be subject to such laws and regulations as the United States may, from time to time, adopt in regard to aboriginal tribes of that country." Treaty on Alaska, March 30, 1867, United States-Russia, art. III, 15 Stat. 539, 542. Subsequent statutes continued the status quo for the most part, *see infra* at 12–14, since Congress never dealt comprehensively with the question of Eskimo lands.

When Alaska became a state in 1959, it was authorized, within 25 years of its admission into the Union, to select more than 100 million acres "from the public lands of the United States in Alaska which are vacant, unappropriated, and unreserved at the time of their selection" for its own. Alaska Statehood Act § 6(b), 48 U.S.C. note prec. § 21 (1976).

In the 1960's, interest developed in the North Slope as a source of oil. Alaska applied for land patents in the area. The Secretary of the Interior tentatively approved the applications. The Statehood Act does not require Eskimo participation in the process, *id.* § 6(g), and none occurred.

The Eskimos, however, complained that they occupied the patented lands and that therefore the lands were not "vacant, unappropriated, and unreserved." The Secretary then stopped granting tentative approvals and withheld final approval of earlier patents. Alaska challenged this action judicially, and the court upheld the Secretary on the ground that occupied lands were not eligible for state selection. *Alaska v. Udall*, 420 F.2d 938 (9th Cir. 1969), *cert. denied*, 397 U.S. 1076, 90 S.Ct. 1522, 25 L.Ed.2d 811 (1970). Under the Statehood Act, however, Alaska was authorized to and did grant conditional leases to the lands that the Secretary tentatively had patented. Alaska Statehood Act § 6(g).

Under the authority of these leases and, the Inupiats claim, in some instances without authority, many oil companies sent exploratory teams to the area. The Inupiats contend that these explorations were trespasses on their land. They assert that the teams damaged the whaling industry; destroyed graveyards; polluted water supplies; scared away fish and game; damaged buildings, campgrounds, cellars and other physical structures; built airports; converted chattels; and caused physical damage to the land. The Inupiats contend also that they should have been paid for the oil companies' use of the land, including the amount the companies would have paid for exploratory rights.

The Inupiats instituted suit in the United States District Court for the District of Columbia against the Secretary of the Interior and three Department officials, alleging that the Secretary's tentative approval of the land patents was invalid and hence that all the leases Alaska had issued also were invalid. They sought a declaratory judgment that the patents and leases were invalid and damages for the trespasses and the government's alleged breaches of its fiduciary obligations to them. Shortly after the suit was filed, however, Congress passed the Settlement Act.

Congress found "an immediate need for a fair and just settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims." 43 U.S.C. § 1601(a). It said, "[T]he settlement should be accomplished rapidly, with certainty, in conformity with the real economic and social needs of Natives, [and] without litigation." *Id.* § 1601(b). Accordingly, section 4 of the Settlement Act provided:

(a) All prior conveyances of public land and water areas in Alaska, or any interest therein, pursuant to Federal law, and all tentative approvals pursuant to section 6(g) of the Alaska Statehood Act, shall be regarded as an extinguishment of the aboriginal title thereto, if any.

(b) All aboriginal titles, if any, and claims of aboriginal title in Alaska based on use and occupancy, including sub-

merged land underneath all water areas, both inland and offshore, and including any aboriginal hunting and fishing rights that may exist, are hereby extinguished.

(c) All claims against the United States, the State, and all other persons that are based on claims of aboriginal right, title, use, or occupancy of land or water areas in Alaska, or that are based on any statute or treaty of the United States relating to Native use and occupancy, or that are based on the laws of any other nation, including any such claims that are pending before any Federal or state court or the Indian Claims Commission, are hereby extinguished.

*Id.* § 1603.

In exchange, Congress gave the Alaskan Natives collectively $962,500,000 and 40 million acres of land in fee simple. *Id.* §§ 1605, 1611, 1613(h). As their share of the award, the Inupiats received approximately $48 million in periodic payments and approximately 5 million acres of land.

On the government's motion for summary judgment, the district court held in the Inupiats' suit that sections 4(a) and (b) extinguished all the Eskimos' land claims and validated Alaska's land patents and the leases under them. *Edwardsen*, 369 F.Supp. at 1376–78. The court, however, refused to dismiss the Eskimos' damage claims. It held that the Settlement Act, particularly section 4(c), had not extinguished the claims for trespass against the trespassers, the claims for breach of fiduciary duty against the federal officials for allowing the trespasses, and the claims for denial of due process in the approval of the land patents. *Id.* at 1378–79. The court further held that the fifth amendment protected those claims. *Id.* at 1379.

In settlement of those remaining claims, the government, on behalf of the Eskimos, agreed to and did sue the State of Alaska and the various trespassers for their trespasses. The Inupiats intervened in the suit. The United States District Court for the District of Alaska held that section 4 extinguished the trespass claims. It ruled that section 4(a) retroactively extinguished the

Inupiats' aboriginal title to most of the land, thereby validating most of the entries. It also held that section 4(c) extinguished all claims based on aboriginal title and that because such title would be an essential element of all the trespass claims, the claims were extinguished. *United States v. Atlantic Richfield Co.*, 435 F.Supp. 1009, 1022–29 (D.Alaska 1977), *aff'd*, 612 F.2d 1132 (9th Cir.), *cert. denied*, 449 U.S. 888, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980). The court further held that the trespass claims were not constitutionally protected property interests. *Id.* at 1029–31. (Almost four months before that decision, the District Court for the District of Columbia had dismissed the remaining portions of the *Edwardsen* suit.)

On appeal, the Ninth Circuit affirmed the ruling that the trespass claims were extinguished. It "agree[d]" with the district court's holding "that § 4(a) was retroactive, and thus that the entries under federal authorization and the conditional state leases ... were not trespasses." 612 F.2d at 1135. The court held also that section 4(c) extinguished all trespass claims. *Id.* at 1135–39. "We hold that the Act extinguished not only the aboriginal titles of all Alaska Natives, but also every claim 'based on' aboriginal title in the sense that the past or present existence of aboriginal title is an element of the claim." *Id.* at 1134 (footnote omitted). The court found it unnecessary to decide "whether or not any Fifth Amendment compensation is required at all for the Native properties and interests taken and extinguished by the United States." *Id.* at 1139. The court noted that this and other questions it left open "[p]erhaps ... will be decided" in the present case.

## II.

The Inupiats filed the present suit before the Ninth Circuit's decision in *Atlantic Richfield*. The complaint contains five causes of action: a) for breach of the government's fiduciary duty to protect the Inupiats by allowing the trespasses; b) for breach of fiduciary duty in authorizing

some of the trespasses; c) for breach of fiduciary duty in failing to take legal action against the trespassers; d) for denial of due process because the Inupiats were not given notice and an opportunity to be heard on Alaska's land patent applications; and e) alternatively, for a compensable taking, by the Settlement Act, of the Inupiats' claims against the government and the trespassers.

In their briefs and at oral argument, however, the Inupiats stated that in light of *Atlantic Richfield* the sole issue before us is whether there has been a taking by the United States of various claims of the Inupiats, for which the Eskimos are entitled to just compensation.

### III.

The government argues that we have no jurisdiction over any of the claims and that the statute of limitations bars all but the trespass taking claim.

■ A. The government points to section 2(f) of the Settlement Act, which provides that "no provision of this Act shall be construed to constitute a jurisdictional act, to confer jurisdiction to sue, nor [sic] to grant implied consent to Natives to sue the United States or any of its officers with respect to the claims extinguished by the operation of the Act." 43 U.S.C. § 1601(f). The government argues that Congress thereby barred this court from exercising jurisdiction in any case involving the Settlement Act.

Section 2(f) does not so provide. It merely makes explicit that the Settlement Act does not give the courts any additional jurisdiction. It does not limit the courts' existing jurisdiction. *Edwardsen*, 369 F.Supp. at 1381.

The government, relying upon *United States v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976), argues that the court has no jurisdiction because there is no statutory waiver of sovereign immunity that mandates the payment of money. The general rule in taking cases, however, is that a promise to pay just compensation is implied unless Congress has explicitly dis-

avowed it. *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 126–27, 95 S.Ct. 335, 349–50, 42 L.Ed.2d 320 (1974); *accord, Dames & Moore v. Regan*, 453 U.S. 654, 689–90, 101 S.Ct. 2972, 2992, 69 L.Ed.2d 918 (1981); *Testan*, 424 U.S. at 401, 96 S.Ct. at 954. There has been no disavowal here. *See supra* at 6. The Inupiats' claims now are all taking claims and therefore are cognizable under this principle.

■ B. The Inupiats filed their petition in this case on December 16, 1977, slightly less than six years after the Settlement Act became effective on December 18, 1971. The government argues that the fiduciary duty and due process claims are time-barred under 28 U.S.C. § 2501 (1976), because the events which gave rise to the claims took place more than six years before the petition was filed. The claims, however, are all for takings, and the alleged act of taking was the Settlement Act. The claims therefore accrued on December 18, 1971, the date on which the Settlement Act became effective. The suit therefore is timely.

### IV.

■ A. With respect to the claims for trespasses committed under the authority of the temporary federal land patents and the temporary state leases (which, according to the court in *Atlantic Richfield*, were "the bulk of all the entries," 612 F.2d at 1135), *Atlantic Richfield* held that because section 4(a) of the Settlement Act was retroactive, those entries "were not trespasses." *Id.* In other words, since the Settlement Act extinguished the aboriginal title of the Inupiats retroactively to the date of the patents and leases, the subsequent entries thereunder necessarily were not trespasses upon any protectible interest the Eskimos had. Accordingly, on the effective date of the Settlement Act the Inupiats no longer had any claims for trespass. The Act, therefore, did not take those trespass claims.

The plaintiff and the defendant in this case were parties in *Atlantic Richfield*. The validity of those trespasses was litigated there, and is binding, by collateral estop-

pel, on the Inupiats' claim for just compensation for the taking of this group of claims for trespass based upon entries pursuant to the federal patents and the state leases. *Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Southern Pacific Railroad v. United States,* 168 U.S. 1, 48–49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897).

B. We reach the same result with respect to the taking of the Inupiats' claim for trespasses on lands not covered by the federal patents and state leases, but for different reasons. This reasoning is equally applicable to the trespass claims for the land covered by the patents and leases, and therefore is an alternative ground for the result reached in part IV A.

*Atlantic Richfield* held that section 4(c) of the Settlement Act "extinguished *all* trespass claims," including trespasses on lands not federally patented and state leased. 612 F.2d at 1135 (emphasis in original). In support of that conclusion, the court referred to the statement in the Conference Committee Report that "the language of settlement is to be broadly construed to eliminate" "*all* aboriginal claims and *all* aboriginal land title . . . as any basis for any form of direct or indirect challenge to land in Alaska." S.Conf.Rep.No.581, 92d Cong., 1st Sess. 40 (1971); H.R.Conf.Rep.No.746, 92d Cong., 1st Sess. 40, *reprinted in* [1971] U.S.Code Cong. & Ad.News 2247, 2253 (emphasis in original). The court also pointed to the statement of former Justice Goldberg, who represented the Alaska Federation of Natives in hearings on the legislation in 1969, that "the Natives . . . are prepared for an extinguishment of anything that is based upon aboriginal title." *Alaska Native Land Claims: Hearings on S.1830 Before the Senate Comm. on Interior and Insular Affairs,* 91st Cong., 1st Sess. 301 (1969) (statement of Hon. Arthur J. Goldberg).

On the basis of this and other legislative history, the court concluded that it would be "incomprehensible to us if Congress did not intend to extinguish the trespass claims, along with all other claims based on aboriginal title, when it gave the Natives over 60,000 square miles of fee simple land and almost a billion dollars." 612 F.2d at 1137 (footnote omitted).

Although the Inupiats are bound by the decision in *Atlantic Richfield* that the Settlement Act extinguished all of their trespass claims, they now seek to recover from the United States the value of the very claims for the extinguishment of which the United States gave the natives $962,500,000 and 40 million acres of land. We agree with the government that the extinguishment of the Inupiats' claims based upon trespasses to their aboriginally held land was not a taking for which the Eskimos may recover just compensation under the fifth amendment. This conclusion follows from the special nature of aboriginal title (of Eskimos and Indians) and the broad power of the United States to extinguish it without payment.

■ Aboriginal title is a right of occupancy based on possession from time immemorial. *Northwestern Bands of Shoshone Indians v. United States,* 324 U.S. 335, 338–39, 65 S.Ct. 690, 692, 89 L.Ed. 985 (1945). Such title may be recognized or unrecognized. If recognized, its extinction is compensable; the taking of unrecognized title is not compensable. *Id.* at 338–40, 65 S.Ct. at 692–93. The Inupiats claim only unrecognized title.

In *Tee-Hit-Ton Indians v. United States,* 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955), the Supreme Court approved a decision of this court that the United States was not required to pay just compensation for taking timber from land in Alaska the Indians held by unrecognized aboriginal title. The Court stated that "the taking by the United States of unrecognized Indian title is not compensable under the Fifth Amendment . . . because Indian occupation of land without government recognition of ownership creates no rights against taking or extinction by the United States protected by the Fifth Amendment or any other principle of law." *Id.* at 285, 75 S.Ct. at 320. The court explained that unrecognized aboriginal title

means mere possession not specifically recognized as ownership by Congress.... This is not a property right but amounts to a right of occupancy which the sovereign grants and protects against intrusion by third parties but which right of occupancy may be terminated and such lands fully disposed of by the sovereign itself without any legally enforceable obligation to compensate the Indians.

*Id.* at 279, 75 S.Ct. at 317.

The Court quoted with approval the following statement from *United States v. Santa Fe Pacific Railroad*, 314 U.S. 339, 347, 62 S.Ct. 248, 252, 86 L.Ed. 260 (1941):

Extinguishment of Indian title based on aboriginal possession is of course a different matter. The power of Congress in that regard is supreme. The manner, method and time of such extinguishment raise political, not justiciable, issues.

348 U.S. at 281, 75 S.Ct. at 318.

■ The Inupiats' suit against the United States for a taking of their trespass claims is based upon their aboriginal title. It was because of that title that they were on the land in the first place; and it was the interference with their possession of the land under that title that was the basis of their trespass claims.

The Inupiats' presence on and use of the land, and the scope, measure, and form of the protection of that presence and use were matters within the exclusive authority and discretion of Congress. Unrecognized aboriginal title is "a right of occupancy which the sovereign grants and protects." *Tee-Hit-Ton*, 348 U.S. at 279, 75 S.Ct. at 317. The Inupiats could use the land only to the extent that Congress protected their right to do so. Congress could protect or fail to protect this land as it saw fit.

When, in the Settlement Act, Congress extinguished both the Inupiats' aboriginal title and "[a]ll claims against the United States, the State and all other persons that are based on claims of aboriginal right, title, use, or occupancy of land," 43 U.S.C. § 1603(c), it terminated not only the Inupiats' title but any claims based upon that title. The Inupiats' right to sue for tres-

pass was merely one aspect of the protection Congress provided for their aboriginal title. The extent and measure of that protection lay within the discretion of Congress to determine.

As noted, "[t]he manner, method, and time" of the extinguishment of aboriginal title "raise political, not justiciable, issues." *Tee-Hit-Ton*, 348 U.S. at 281, 75 S.Ct. at 318; *Santa Fe*, 314 U.S. at 347, 62 S.Ct. at 252. The right to sue for trespass is one component of the bundle of rights that aboriginal title provides but which Congress may grant, limit, or extinguish as it sees fit. When, as an incident to extinguishing the aboriginal title itself, Congress in the Settlement Act also extinguished the Indians' claims for trespass to the lands possessed under that title, it made a political decision not subject to judicial reexamination. Congress's authority to extinguish aboriginal title without payment also authorized it without payment to extinguish the trespass claims based upon that title. *Cf. Battaglia v. General Motors Corp.*, 169 F.2d 254, 259 (2d Cir.), *cert. denied*, 335 U.S. 887, 69 S.Ct. 236, 92 L.Ed. 425 (1948) (purely statutory claims subject to extinction after vesting before judgment).

The Inupiats argue, however, that their situation should be analogized to that of a tenant at will who, after his tenancy has been terminated, may maintain an action for trespasses committed before termination. The analogy fails because of the special and limited nature of aboriginal title and the broad discretionary authority of Congress to extinguish such title upon whatever terms and conditions it deems appropriate.

For the same reasons, the Inupiats' further reliance upon cases that have defined the rights of Indians living upon reservations created by Executive order must be rejected. Those cases, *Hynes v. Grimes Packing Co.*, 337 U.S. 86, 103, 69 S.Ct. 968, 979, 93 L.Ed. 1231 (1949), and *United States v. Southern Pacific Transportation Co.*, 543 F.2d 676, 685–87 (9th Cir. 1976), held that Indians living on such reservations, whose

rights in many respects are similar to rights under aboriginal title, could bring suits to protect the land from trespasses. The cases never considered whether Congress could abolish such claims as a function of abolishing the reservations. The cases thus are inapposite.

## V.

■ The Inupiats further contend that the United States breached its fiduciary obligation to them by authorizing and failing to prevent the trespasses that occurred prior to the Settlement Act. They argue that they had enforceable damage claims against the United States based upon those breaches of fiduciary duty and that the Settlement Act constituted a taking of those claims for which they are entitled to just compensation. The reasons set forth in part IV B for rejecting the claim of a taking of the trespass claims apply equally to the alleged taking of the fiduciary obligation claims which, like the taking claims, are based upon the Inupiats' aboriginal title. These claims also are invalid for another reason.

The legal sufficiency of this group of taking claims depends upon whether the government's alleged breach of fiduciary obligations created claims that the Inupiats could have enforced through suit in this court against the United States for damages.

In *Mitchell v. United States*, 229 Ct.Cl. ——, 664 F.2d 265 (1981), we recently summarized the law in this court governing the maintenance of claims by Indians based upon the government's alleged violation of its fiduciary obligations to them. Where, as in the present case, the alleged fiduciary duty stems from a statute, the statute "must be capable of being fairly 'interpreted as mandating compensation by the Federal Government for the damage sustained.'" *Id.* at ——, 664 F.2d at 267–68 (citation omitted). The court pointed out that although "the substantive right to money" need not "be explicitly stated in the substantive legislation itself, ... Congress's waiver of sovereign immunity with respect

to money compensation must be clear or strong before the court can say that the statute mandates compensation." *Id.* at ——, 664 F.2d at 268–69 (footnote omitted).

Applying those principles, we held that in certain of the statutes upon which the Indians relied, Congress mandated the payment of compensation, *id.* at ——, 664 F.2d at .269–73, but that other statutes were "almost purely regulatory, involving Congress's plenary power over Indians, and do not themselves mandate any compensation to the plaintiffs" for the alleged injury for which they sought compensation. *Id.* at ——, 664 F.2d at 275.

In the present case, the Inupiats rely upon a number of statutes which, according to them, mandate the payment of compensation. We disagree and conclude that they are only regulatory provisions that do not waive the government's sovereign immunity.

A. 1. Section 8 of the Act of May 17, 1884, ch. 53, 23 Stat. 24, 26, provides

[t]hat the Indians or other persons in said district [of Alaska] shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress.

In *Tee-Hit-Ton*, the Court held that this statute did not recognize the Eskimos' aboriginal title. 348 U.S. at 277–79, 75 S.Ct. at 316–17. "Rather, it clearly appears that what was intended was merely to retain the *status quo* until further congressional or judicial action was taken." *Id.* at 278, 75 S.Ct. at 317 (footnote omitted).

This statute, unlike the statutes that we held in *Mitchell* conferred a right to sue for money, does not deal with the government's management of "Indian-owned property ... from which Congress clearly wanted the Indians to obtain the financial benefits." 229 Ct.Cl. at ——, 664 F.2d at 273.

2. The Act of March 3, 1891, ch. 561, § 14, 26 Stat. 1095, 1100, states that "none of the provisions of the last two preceding

sections of the act shall be so construed as to warrant the sale of any lands ... to which the natives of Alaska shall have prior rights by virtue of actual occupation." This statute, like the one just discussed, does not deal with the government's management of Eskimo property and similarly does not mandate compensation.

3. Section 7 of the Act of May 14, 1898, ch. 299, 30 Stat. 409, 412, exempts Indian reservation lands from being subject to the homestead laws and the private condemnation of rights-of-way for railroads. It does not refer to aboriginal title lands and is inapplicable here.

4. The Act of June 6, 1900, ch. 786, § 27, 31 Stat. 321, 330, provides that "Indians or persons conducting schools or missions in the district shall not be disturbed in the possession of any lands now actually in their use and occupation ...; but nothing contained in this Act shall be construed to put in force in the district the general land laws of the United States." This statute also was considered in *Tee-Hit-Ton* and was found not to recognize the Eskimos' aboriginal title, but only to continue the status quo. 348 U.S. at 277–79, 75 S.Ct. at 316–17. Once again, it has nothing to do with government management of Eskimo property and is not a waiver of sovereign immunity.

5. The Nonintercourse Act, 25 U.S.C. § 177 (1976), prohibits the purchase of an interest in land from Indians except by treaty. It provides that

[e]very person who, not being employed under the authority of the United States, attempts to negotiate such treaty or convention ... or to treat with any such nation or tribe of Indians for the title or purchase of any lands by them held or claimed, is liable to a penalty of $1,000.

There is nothing here that waives sovereign immunity.

6. Finally, the Inupiats rely on section 4 of the Statehood Act, which provides that Alaska and its people

disclaim all right and title ... to any lands or other property (including fishing rights), the right or title to which may be held by any Indians, Eskimos, or Aleuts ... or is held by the United States in trust for such natives; that all such lands or other property, belonging to the United States or which may belong to said natives, shall be and remain under the absolute jurisdiction and control of the United States until disposed of under its authority.

This, however, is nothing more than a recognition of federal supremacy. It imposes no duty on the federal government.

B. The Inupiats rely also on two regulations of the Department of the Interior. The first provides that

[a]uthorized officers will ascertain by any means in their power whether any public lands in their districts are occupied by Indians and the location of their improvements, and will suspend all applications made by others than the Indian occupants, upon lands in the possession of Indians who have made improvements of any value whatever thereon.

43 C.F.R. § 2091.5 (1981). The second provides that, "Lands occupied by Indians, Aleuts, and Eskimos in good faith are not subject to entry or appropriation by others." *Id.* § 2091.6–3. Neither regulation deals with federal management of the Eskimos' property. Moreover, only Congress, and not the Secretary of the Interior, can waive sovereign immunity.

C. The Inupiats cite the portion of the Tucker Act that gives this court jurisdiction over "any claim against the United States ... for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491 (Supp. IV 1980). They contend this phrase is both a substantive and a jurisdictional grant of authority and that it waives sovereign immunity.

We have rarely discussed this provision. In *Menominee Tribe of Indians v. United States*, 221 Ct.Cl. 506, 516–20, 607 F.2d 1335, 1342–44 (1979), we held that it was not a basis for jurisdiction of a nonconstitutional claim that Congress had breached its duty in enacting a statute. One commentator has written that, "The evident purpose

**132**

of the section is to make clear that the action may seek unliquidated damages as well as sums illegally exacted or amounts fixed by contract. Indeed a literal reading of the language would swallow practically everything that precedes it." 1 J. Moore, Federal Practice ¶ 0.65[2.–3] at 700.112 n.39 (1982).

Without adopting Professor Moore's reading of the phrase, we hold that this provision does not give us jurisdiction over claims for breach of fiduciary duty unless there also is a statute or a valid regulation mandating the payment of money.

### VI.

■ The Inupiats' final claim is that the United States denied them due process because it did not give them notice of or the opportunity to be heard on Alaska's application for land patents, that they had a claim for damages against the United States for this denial of due process, and that the Settlement Act took that claim. As in the case of the claim for fiduciary obligations discussed in part V, the validity of this taking claims depends upon whether the Inupiats had a valid due process damage claim against the United States.

Since the due process claim obviously involves more than $10,000, it could have been brought only in this court and not in a district court. 28 U.S.C. §§ 1346(a)(2), 1491 (Supp. IV 1980). We have frequently and consistently held, however, that we have no jurisdiction over claims for money based upon the government's alleged violation of the due process clause. *Conservative Caucus, Inc. v. United States,* 228 Ct.Cl. ——, 650 F.2d 1206 (1981); *Mack v. United States,* 225 Ct.Cl. ——, 635 F.2d 828 (1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1988, 68 L.Ed.2d 304 (1981); *Carruth v. United States,* 224 Ct.Cl. ——, 627 F.2d 1068 (1980).

The Inupiats point to *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), which implied a cause of action for damages based upon violation of the due process clause. The suit in *Davis,* however, was brought against a former Congressman as an individual, and the Court held only

that the plaintiff had stated a valid cause of action against him. Nothing in the opinion even suggests that a similar suit could be maintained against the United States.

### CONCLUSION

The defendant's motion to dismiss is granted, the plaintiff's motion for partial summary judgment is denied, and the petition is dismissed.