**Burton MARKS and Harry Umann**

v.

**The UNITED STATES.**

**No. 737–85C.**

United States Claims Court.

Oct. 18, 1988.

Burton Marks, Beverly Hills, Cal., (deceased) attorney of record for plaintiffs.

Terrence S. Hartman, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant. Michael N. Glanz, Dept. of State, and Rochelle Stern, Dept. of Treasury, of counsel.

## MEMORANDUM OF DECISION

HARKINS, Senior Judge.

This case is before the court on cross-motions for summary judgment. Plaintiffs, Burton Marks and Harry Umann, are represented pro se; both Mr. Marks and Mr. Umann are attorneys. Mr. Marks was attorney of record.

After briefing on the cross-motions was completed and an order was entered scheduling oral argument, the court was advised that Mr. Marks on February 17, 1987, had undergone open heart surgery. Subse-

quently, on May 22, 1987, the court was notified that Mr. Marks was deceased.

The case was suspended to permit substitution of the Estate of Burton Marks as a plaintiff, and the designation of a new attorney of record. An effort was made to determine whether Mr. Umann would proceed as attorney of record. Mr. Umann advised the court that he would not enter an appearance, and that he would not represent himself or Mr. Marks. Efforts to ascertain whether the Estate of Burton Marks would be substituted as a plaintiff in this case were not successful. On December 15, 1987, the following order was entered:

In the absence of a communication from the Estate of Burton Marks, on or before 30 days from the date of this order, this case will be decided on the basis of defendant's motion for summary judgment, filed May 15, 1986, and plaintiff's cross-motion for summary judgment, filed July 8, 1986, and related papers.

There has been no response from the Estate of Burton Marks. In the absence of a motion for substitution, pursuant to RUSCC 25(a)(1), the Clerk is directed to dismiss the complaint as to Burton Marks. The action proceeds as to the claims of Harry Umann. RUSCC 25(a)(2).

Without oral argument, on the basis of information in the motion papers, it is determined that there is no genuine issue as to any material fact and that defendant is entitled to judgment as a matter of law.

Plaintiffs' claim is based on an assignment made on April 25, 1976, of a judgment that had been issued on October 14, 1948, against the Ministry of Roads of the Government of Iran by the Iranian Court of Cassation. The judgment was obtained by G.M. Yanikian, an Iranian national who in 1955 became a naturalized citizen of the United States. The judgment was for 2,198,504.10 rials, which at 1948 exchange rates was equivalent to $68,170.67. The judgment was assigned to plaintiffs for legal services rendered.

After the United States Embassy in Iran was seized on November 4, 1979, and hos-

tages taken, the President declared a national emergency under the International Economic Emergency Powers Act (IEEPA), to block removal of property of Iran, and the Secretary of the Treasury issued regulations to implement the blockade. Exec. Order No. 12,170, 44 Fed.Reg. 65,729, (1979); 50 U.S.C. §§ 1701–06 (Supp. III 1979); 31 C.F.R. §§ 535.101–535.904 (1979). The President granted a general license that authorized certain judicial proceedings, but did not authorize entry of any judgment or decree. 31 C.F.R. § 535.504; 44 Fed.Reg. 67,617 (1979).

In June 1980, plaintiffs obtained a default judgment against the Imperial Government of Iran in the Superior Court, Los Angeles County, California (Case No. C157589) in the amount of $2,452,819.56 (principal sum of $68,170.67, plus prejudgment interest, at 12 percent, plus costs). A writ of execution in enforcement of the judgment was issued in July 1980. After plaintiffs' applied on August 12, 1980, for a license to enforce and collect on the judgment, the United States in September 1980, filed in the California Superior Court a suggestion of interest and a motion to quash the writ of execution. On October 20, 1980, the Superior Court quashed the writ of execution and vacated the judgment on the ground they were contrary to controlling Federal law.

On January 19, 1981, the United States executed the "Algiers Accords" which authorized creation of the Iran–United States Claims Tribunal (Tribunal), and the President issued Executive Orders to implement the Accords, by requiring all banks to transfer all Iranian assets in their possession as directed by the Secretary of the Treasury. *See* Exec. Order No. 12,279, 46 Fed.Reg. 7,919 (1981); Exec. Order No. 12,-280, 46 Fed.Reg. 7,921 (1981). Executive Order No. 12,294 continued the suspension of all claims against Iran, except as they may be presented to the Tribunal. Exec. Order No. 12,294, 46 Fed.Reg. 14,111 (1981). Executive Order No. 12,294 provided the suspension would terminate on a determination by the Tribunal that it did not have jurisdiction over the claim.

In January 1982, plaintiffs filed a claim with the Tribunal that sought $2,452,-818.83, plus interest, and was founded upon the 1948 judgment issued by the Iranian Court of Cassation. On September 30, 1982, plaintiffs amended the statement of claim to substitute a new rials/dollar exchange rate and to add new items, which increased the claimed amount to $25,851,-440.40. The Tribunal on September 12, 1985, dismissed the claim for lack of jurisdiction over any of its items.

On October 17, 1985, the California Superior Court entered a default judgment in favor of plaintiffs against Iran in the amount of $2,610,235.03. On December 16, 1985, plaintiffs filed a complaint in this court to recover damages in that amount.

The complaint states claims in three counts: (1) a taking of private property without just compensation contrary to the Fifth Amendment to the Constitution; (2) that the IEEPA, the Iranian Asset Control Regulations and Executive Orders Nos. 12,-170, 12,279 and 12,280 destroyed the value of plaintiffs' claim and eliminated plaintiffs' remedy; and (3) an implied-in-fact contract arising under the foregoing statutes and regulations. Each of these counts is based upon the theory that actions of the United States constitute a taking of plaintiffs' property inherent in the 1980 and 1985 judgments of the California Superior Court.

1. Plaintiffs' assertion that defendant has taken their property interest in the claim against Iran and in the California Superior Court judgments involves: (i) whether the judgment and writ issued by the Iranian Court of Cassation is the type of property interest that would support a constitutional claim for compensation; (ii) whether the 1980 judgment was taken; (iii) whether the suspension of plaintiffs' claim, pending disposition by the Tribunal, amounted to a taking; and (iv) whether plaintiffs' 1985 judgment has been rendered valueless by the United States.

The 1976 assignment of the 1948 judgment of the Iranian Court of Cassation was not directly or automatically effective to reach any Iranian assets located in the

United States. The judgment creditor of a foreign judgment (a judgment rendered in another jurisdiction, whether in a foreign-country or a sister state) must depend upon the assistance of local courts for recognition and enforcement of the judgment. E.F. Scoles & P. Hay, *Conflict of Laws,* §§ 24.3–24.36 (1984). California has adopted the Uniform Foreign Money–Judgments Recognition Act (1962) (Foreign Money Act), which provides for recognition and enforcement of a foreign-country judgment in the same manner as the judgment of a sister state is entitled to full faith and credit.

█ Until a foreign-country judgment is recognized through either domestic channels or through diplomatic channels, the holder of a judgment does not have a legally enforceable right. Plaintiffs' claim against Iran had the status of a sister state judgment and thus, plaintiffs' only recourse was to petition for recognition and enforcement in state court. In this case, until the California Superior Court recognized the Iranian judgment, plaintiffs had not completed the process of domestic recognition. Plaintiffs were simply owners of a debt owed them by the Iranian Government. Plaintiffs did not have a property interest in the Iranian judgment in itself that entitled it to fifth amendment protection. The principles of international law that operated in *Shanghai Power Co. v. United States,* 4 Cl.Ct. 237 (1983), *aff'd,* 765 F.2d 159 (Fed.Cir.), *cert. denied,* 474 U.S. 909, 106 S.Ct. 279, 88 L.Ed.2d 243 (1985), are not applicable to plaintiffs' Iranian judgment The claim in *Shanghai* involved an expropriation in which rights are recognized under international law, and which generally are compensated through the doctrine of espousal.

During the period plaintiffs' petition for enforcement of the Iranian judgment was pending in the California Superior Court, the Iranian hostage crisis occurred and the President caused regulations to be issued that nullified any judgment in which there existed an interest of Iran. 31 C.F.R. § 535.203(e) (1980). The 1980 default judgment and writ were issued after the regulations became effective.

Plaintiffs had no property interest in the 1980 judgment and writ because they were obtained in contravention of the Iranian Assets Control Regulations. *Kaiser Aetna v. United States,* 444 U.S. 164, 178, 100 S.Ct. 383, 392, 62 L.Ed.2d 332 (1979); *United States v. Willow River Power Co.,* 324 U.S. 499, 503, 65 S.Ct. 761, 764, 89 L.Ed. 1101 (1945).

Plaintiffs argue that the regulations did not apply to *in personam* claims, and that the Superior Court was in error. The Superior Court's voiding of its judgment destroyed the 1980 judgment in its entirety, and left plaintiffs with a foreign-country judgment which had not been recognized by any United States court. There was no legally protected property interest.

Any error in the Superior Court's action cannot be reviewed in this court. If plaintiffs believed there was error, they should have sought review in the California appellate courts. Plaintiffs' suggestion that this court should sanction defendant, for submitting to the California Superior Court its suggestion of interest and motion to quash, is without merit.

█ Executive Order No. 12294 suspended all claims which may be presented to the Tribunal. This suspension was valid. *Dames & Moore v. Regan,* 453 U.S. 654, 684–85, 101 S.Ct. 2972, 2989–90, 69 L.Ed.2d 918 (1981). The prohibition in the order and regulations against trying plaintiffs' claim in any forum other than the Tribunal does not amount to a taking. Plaintiffs had an alternative forum, and an opportunity for a remedy, and plaintiffs availed themselves of that opportunity. *Dames & Moore v. Regan,* 453 U.S. at 686–87, 101 S.Ct. at 2990–91. There is no evidence that plaintiffs could have satisfied their claim had it not been suspended. *Shanghai Power Co. v. United States,* 4 Cl.Ct. at 242–43.

█ Plaintiffs' argument that their claim was rendered valueless because the Tribunal did not settle it is without merit. The 1985 judgment reflects that plaintiffs' Ira-

nian judgment claim revived after the Tribunal dismissed its proceedings. Plaintiffs' cannot now be heard to complain that they lack a forum for satisfaction of this claim. The property interest plaintiffs may have in the Iranian judgment and writ, and in the 1985 default judgment, does not include the quarantee that the default judgment ultimately can be satisfied. The fact that there may be now no assets left in the United States with which to satisfy the 1985 judgment does not establish that there has been a taking. Plaintiffs have made no showing of any attempt to satisfy the 1985 judgment, in the United States or elsewhere.

■] The President's authority to order the transfer of all Iranian assets out of the country cannot be challenged. The action was taken pursuant to specific congressional authorization and is supported by the strongest presumptions and widest latitude of judicial interpretation. *Dames & Moore v. Regan*, 453 U.S. at 674, 101 S.Ct. at 2984; *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637, 72 S.Ct. 863, 871, 96 L.Ed. 1153 (1952) (Jackson, Jr. concurring).

2. Plaintiffs have injected taking law into their contention that they have a claim that arises by reason of the operation of statutes and regulations. Plaintiffs contend that the IEEPA, the Iranian Assets Control Regulations, and Executive Orders Nos. 12,170, 12,279 and 12,280, mandate payment of compensation for interference with their constitutionally protected property rights. Plaintiffs concede that the IEEPA, the regulations and the Executive Orders do not contain explicit provisions for compensation for the taking of property or impairment of rights, but contend that such provisions are unnecessary when there has been a taking.

■ Any asserted entitlement to money damages under the Tucker Act due to operations of statute or regulation depends on whether the relevant federal authority "can be fairly interpreted as mandating compensation by the Federal Government for the damage sustained." *United States v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976) (quoting *East-*

*port S.S. Corp. v. United States*, 372 F.2d 1002, 1009, 178 Ct.Cl. 599 (1967)). Plaintiffs erroneously equate the compensation the government is required to pay when there is an unlawful taking with the jurisdictional requirement that statutes and regulations must be fairly read so as to mandate the payment of compensation.

Plaintiffs' claim in count 2 is not founded upon the Fifth Amendment as their argument implies. Plaintiffs cite the *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) and *Inupiat Community of Arctic Slope v. United States*, 680 F.2d 122, 230 Ct.Cl. 647 (1982) to support their argument that explicit payment provisions are unnecessary. Plaintiffs misapprehend these cases; both involved taking claims. Both require a plaintiff to establish first that a taking has occurred before an obligation to pay compensation arises. Plaintiffs ignore the explicit requirement that a plaintiff must first establish a taking before a court will hold that compensation is impliedly promised.

■] 3. The elements of an implied-in-fact contract are as follows: A contract implied-in-fact requires a showing of the same mutual intent to contract as that required for an express contract. The fact that an instrument was not executed is not essential to consummation of the agreement. It is essential, however, that the acceptance of an offer be manifested by conduct that indicates assent to the proposed bargain. The requirements of mutuality of intent, and the lack of ambiguity in offer and acceptance, are the same for an implied-in-fact contract as for an express contract; only the nature of the evidence differs. The officer whose conduct is relied upon must have had actual authority to bind the government in contract. *ATL, Inc. v. United States*, 4 Cl.Ct. 672, 675, aff'd, 735 F.2d 1343 (Fed.Cir.1984); *Pacific Gas & Electric Co. v. United States*, 3 Cl.Ct. 329, 338–39 (1983). It is plaintiffs' burden to establish facts showing that an implied-in-fact contract was made. *Id.* at 339.

■ Plaintiffs' theory that they have an implied-in-fact contract is based upon the allegation that their property was taken. Plaintiffs fail to establish a taking in the context of their count (3) argument. Nor have plaintiffs alleged any of the elements necessary to establish an implied-in-fact contract. Plaintiffs have not demonstrated the required mutual intent, and in fact argue that mutual intent is unnecessary. Plaintiffs do not identify the government official who had authority to bind the United States to such a promise. Plaintiffs fail to demonstrate how the Algiers Accords, regulations, orders, and motion to quash and vacate are contractual in nature and represent an undertaking to guarantee to plaintiffs that they could satisfy a judgment by attaching Iranian assets.

On the basis of the foregoing,

IT IS ORDERED: defendant's motion for summary judgment is ALLOWED; plaintiffs' cross-motion for summary judgment is DENIED. The Clerk is directed to dismiss the complaint. No costs.