Lillian CAPENER, Appellant,

v.

TANADGUSIX CORPORATION, Appellee.

No. S–4598.

Supreme Court of Alaska.

Nov. 4, 1994.

John E. Havelock, Ely & Havelock, Anchorage, for appellant.

Terrance A. Turner, Scott J. Nordstrand, Owens & Turner, P.C., Anchorage, for appellee.

### ORDER

Before MOORE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

On consideration of the appellee's petition for rehearing, filed on October 14, 1994,

IT IS ORDERED:

1. The petition for rehearing is GRANTED in part. Changes are made on pages 1066 and 1074. [Editor's Note: Changes incorporated for purposes of publication.]

2. Opinion No. 4134, published on October 7, 1994, is WITHDRAWN.

3. Opinion No. 4142, is issued on this date in its place

EASTAUGH, J., not participating.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

*OPINION*

MATTHEWS, Justice.

## I. INTRODUCTION

The Alaska Native Claims Settlement Act (ANCSA or the Act) enacted in 1971 (codified at 43 U.S.C. § 1601–1629a (1986)) extinguished the aboriginal title claims of the Native people of Alaska in exchange for 962.5 million dollars and 44 million acres of public land. In order to receive this money and land, the Act called for the creation of thirteen regional and over two hundred village corporations. *See Kenai Peninsula Borough v. Cook Inlet Region, Inc.*, 807 P.2d 487, 490 (Alaska 1991).

Congress included in ANCSA a number of provisions designed to protect the rights of those who have valid existing rights to land subject to conveyance under the Act. Thus conveyances to Native corporations must be made subject to the provisions of existing leases, contracts and permits. ANCSA § 14(g), 43 U.S.C. § 1613(g). Those who have made prior lawful entries for the purpose of gaining title to a homestead, a headquarters site, a trade and manufacturing site, or a small tract site are protected and entitled to a patent when they meet the requirements of the law under which they enter. ANCSA § 22(b), 43 U.S.C. § 1621(b). Similarly, those who have prior valid mining claims and locations are protected. ANCSA § 22(c), 43 U.S.C. § 1621(c). In addition, there are provisions which require conveyances to individuals or organizations on the basis of their occupancy for a particular purpose rather than the presence of a valid existing right or a lawful entry under the public land laws. This case involves the interpretation of two such provisions, sections 14(c)(1) and (2).[1] *See* 43 U.S.C. § 1613(c)(1) & (2).

---

1. Sections 14(c)(1) and (2) are set forth at note 5 *infra*.

 Another provision of the Act under which the right to a conveyance is triggered merely by occupancy rather than a legally regulated entry is what one text calls the "hermit clause," section 14(h)(5), under which the Secretary of the Interior "may convey to a Native ... the surface estate in not to exceed 160 acres of land occu-

pied by the Native as a primary place of residence on August 31, 1971." *See* Robert D. Arnold, *Alaska Native Land Claims*, 253 (Alaska Native Foundation, 1978). According to the text this provision applies to residences away from villages or cities. *Id.* That limitation may be practical rather than legal, however, as it is not expressed in the Act.

Section 14(c)(1) requires village corporations to reconvey land "to any Native or non-Native occupant" who occupied the land on a specific date,[2] for any one of four designated purposes: as a primary residence, a primary place of business, a subsistence campsite, or a headquarters for reindeer husbandry. Section 14(c)(2) requires village corporations to reconvey to "the occupant" land which is occupied as of December 18, 1971,[3] by a nonprofit organization. The main issue in this case is the meaning of the term "occupant" as used in these sections.

## II. *FACTS AND PROCEEDINGS*

Lillian Capener is a missionary affiliated with the Assemblies of God Church. She and her husband, Reverend A.E. Capener, built a church, house and garage on federal land in the village of St. Paul in 1966. The Capeners entered the land under the auspices of a special use permit issued by the Bureau of Commercial Fisheries to the "Assemblies of God Home Missions Department" dated July 7, 1966. The permit was for the described purpose of "constructing, establishing, creating, and maintaining a church and parsonage, and for no other purpose whatever during the period from July 1, 1966, to June 30, 1976." The permit provided for automatic yearly renewals after June 30, 1976, unless terminated with thirty days written notice.

Reverend and Mrs. Capener constructed the church building on Lot 1, Block 20, City of St. Paul. Their house was located on Lot 3. The Capeners added a small garage, a large garage and a basement to the house. The large garage has been used for a motorcycle rental and tourist service business since 1972 or 1973. Mrs. Capener testified that Lot 2 is used for parking and as a garden incidental to her business and home.

In 1974 the Village Corporation of St. Paul, Tanadgusix Corporation (TDX), selected property under ANCSA which encompassed the lots in question.[4] In 1979 the Bureau of Land Management issued a patent to TDX which included these lots, subject to existing permit rights and to the duty to convey if and as required by section 14(c) of ANCSA.

In September of 1980 TDX informed the Capeners and the Home Missions Department that it now administered the special use permit. TDX notified them that it was terminating the permit as of June 30, 1981, unless new lease arrangements could be made. The Home Missions Department and the Capeners refused to enter into a lease and asserted a claim under section 14(c) of ANCSA. A.E. Capener died in 1986. Lillian Capener continued to reside on the property, to conduct church services, and to operate the motorcycle rental and tourist service business.

Effective June 19, 1988, TDX purported to terminate the special use permit. On August 2, 1988, Capener and W.J. Bransford, District Superintendent of the Alaska District Council, Inc., an Assemblies of God organization, were sent notices to quit the St. Paul premises. A few days later Capener discussed the situation with Assembly of God officials in Anchorage and Missouri and was told "I could have this property to do with as I wish, as at the time, they could not afford the legal expenses. They specifically called to tell me that I could 'sell' it for whatever I wished and I could 'keep the money.'" On August 10, 1988, Bransford, on behalf of the Home Missions Department and the Alaska District Council, Inc., signed a document which "disclaims all interest" in the lots and the special use permit.

On September 12, 1988, TDX filed a forcible entry and detainer action against Capener. The trial court dismissed the complaint because a question of title had been raised. TDX was allowed to amend its complaint to assert claims for ejectment and quiet title. Capener counterclaimed, contending that ti-

---

**2.** The occupancy date under section 14(c)(1) for Pribilof Island land is the date of conveyance to the village corporation. That date for the land in this case is January 19, 1979.

**3.** December 18, 1971, was the date ANCSA was passed.

**4.** As a corporation representing a village of more than 500 people TDX was entitled to a patent to the surface estate of 138,240 acres. 43 U.S.C. § 1613(a) (1986); Arnold, *supra* note 1, at 243. TDX's selection encompassed virtually all of St. Paul Island. Arnold, *supra*.

tle ought to be quieted in her favor. She also sought a declaration that she is the lawful owner of the lots. Both parties moved for summary judgment. The trial court granted the motion of TDX, denied that of Capener, and entered a final judgment in favor of TDX on all of its claims. This appeal followed.

## III. DISCUSSION

### A. Section 14(c) contentions.

The major issues in this case require an understanding of the meaning and operation of sections 14(c)(1) and (2) of ANCSA. We set forth these provisions as well as section 14(c)(3) in the margin at this point.[5]

Capener relies on sections 14(c)(1) & (2) to support her right to title to the property in question. Her first argument, concerning Lots 2 and 3, is essentially a plain language argument. She contends that the literal language of 14(c)(1) only requires occupancy, as of January 19, 1979,[6] as a primary residence or primary place of business. She argues that she meets this requirement as she had occupied the house as her residence for more than eleven years as of the critical date and

had used the annexed garage for her rental and tourist service business for some six years.

With respect to Lot 1, the church building, Capener contends that the Assemblies of God faith is not of a hierarchical nature and that each minister and local church is autonomous. She argues that the local church, an unincorporated nonprofit organization, has been the occupant of Lot 1 since well before the critical date under section 14(c)(2), December 18, 1971, and under a plain reading of that section is therefore entitled to a conveyance. She is its representative and should, she contends, take title as trustee.

With respect to all three lots, Capener makes an alternative claim that she is the transferee of the Home Missions Department because it "yielded any interest it might have to her in advance of the general disclaimer."

TDX makes two arguments as to why Capener should not be considered an occupant despite her claim that she meets the literal definition of that term. First, TDX argues that the fact that the permittee was the Home Missions Department disqualifies Ca-

---

**5.** These sections provide:

(c) **Patent requirements; order of conveyance; vesting date; advisory and appellate functions of Regional Corporations on sales, leases or other transactions prior to final commitment.**
Each patent issued pursuant to subsections (a) and (b) of this section shall be subject to the requirements of this subsection. Upon receipt of a patent or patents:
(1) the Village Corporation shall first convey to any Native or non-Native occupant, without consideration, title to the surface estate in the tract occupied *as of December 18, 1971 (except that occupancy of tracts located in the Pribilof Islands shall be determined as of the date of initial conveyance of such tracts to the appropriate Village Corporation)* as a primary place of residence, or as a primary place of business, or as a subsistence campsite, or as headquarters for reindeer husbandry;
(2) the Village Corporation shall then convey to the occupant, either without consideration or upon payment of an amount not in excess of fair market value, determined as of the date of initial occupancy and without regard to any improvements thereon, title to the surface estate in any tract occupied *as of December 18, 1971,* by a nonprofit organization;
(3) the Village Corporation shall then convey to any Municipal Corporation in the Native

village or to the State in trust for any Municipal Corporation established in the Native village in the future, title to the remaining surface estate of the improved land on which the Native village is located and as much additional land as is necessary for community expansion, and appropriate rights-of-way for public use, and other foreseeable community needs: *Provided,* That the amount of lands to be transferred to the Municipal Corporation or in trust shall be no less than 1,280 acres *unless the Village Corporation and the Municipal Corporation or the State in trust can agree in writing on an amount which is less than one thousand two hundred and eighty acres: Provided further, That any net revenues derived from the sale of surface resources harvested or extracted from lands reconveyed pursuant to this subsection shall be paid to the Village Corporation by the Municipal Corporation or the State in trust: Provided, however, That the word "sale", as used in the preceding sentence, shall not include the utilization of surface resources for governmental purposes by the Municipal Corporation or the State in trust, nor shall it include the issuance of free use permits or other authorization for such purposes*[.]
(Emphasized language added in 1980, Pub.L. 96–487 § 1404(a) and (b) and § 1405.)

**6.** *See* note 2 *supra.*

pener from occupant status. Second, TDX argues that even if Capener had been the permittee, she could not have received a conveyance because the permit was revocable.

Concerning Capener's argument that the local church organization was the occupant of the church building, TDX similarly contends that the fact that the permit was issued to the Home Missions Department disqualifies any such local organization from claiming rights under section 14(c)(2) as an occupant. With respect to Capener's claim that the Home Missions Department orally transferred the property to her, TDX contends that such a transfer would be ineffective because the Home Missions Department had no conveyable legal interest, transfer of the permit was invalid under the terms of the permit, and the transfer was barred by the statute of frauds.

**B. Summary of questions presented and holdings under section 14(c).**

The parties' arguments raise at least three legal questions which require resolution in this case. They can be expressed as follows:

1. Assuming the occupancy purpose requirements of section 14(c)(1) or (2) are met, can a permittee under a revocable permit be an occupant entitled to a reconveyance?

2. Assuming the occupancy purpose requirements of section 14(c)(1) or (2) are met, can one who occupies property which is subject to a revocable permit issued to another be an occupant entitled to a reconveyance?

3. Can the right to reconveyance under section 14(c)(1) or (2) be transferred subsequent to the occupancy date set forth in the Act?

For the reasons that follow, our answers to these questions are:

1. Yes.

2. Yes, if the occupier has an equitable ownership interest in the improvement on the property on the legal occupancy date.

3. Yes.

Because questions of fact exist concerning the equitable ownership interest of Capener and the local church, and concerning whether a transfer was intended from the Home Missions Department to Capener, we reverse the judgment of the superior court and remand this case for further proceedings.

**C. The trial court's opinion.**

The trial court explicitly dealt only with Capener's argument that she was an occupant of the residence and place of business under section 14(c)(1). The court's opinion on this point was as follows:

In its briefing, TDX correctly asserts that only the church possessed a possible § 14(c)(1) claim, a claim which has never been adjudicated and which the church has now disclaimed. Mrs. Capener occupied the land subject to the church's rights, and the church, not Mrs. Capener, received the permit. As TDX points out, the church could have removed the Capeners from the property at any time.

TDX also points to the fact that the permit was subject to revocation, and argues that TDX validly exercised this revocation right. TDX further argues that the property could not qualify as a primary place of business, because the rental business constitutes an unlawful occupation, run in violation of the permit, and without TDX's permission.

The Alaska Supreme Court, in interpreting § 14(c), broadly interpreted the "primary place of business" requirement. In *Hakala v. Atxam,* 753 P.2d 1144 (1988), the court found that Congress intended § 14(c)(1) to give title to people who "had previously utilized the lands in an established, legal and routine fashion". *Id.* at 1147. The United States Court of Appeals in *Donnelly v. United States,* 850 F.2d 1313 (9th Cir.1988), articulated the other side of the spectrum when it held that § 14(c)(1) could not be used to give "amnesty" for "trespassers, failed homesteaders, or land users without any vested rights prior to December 1, 1971". *Id.* at 1320 (quoting the District Court). The *Donnelly* court added that "there was no indication of congressional intent to over-

ride the established principle that individuals could obtain no rights to withdrawn lands...." Moreover, the congressional intent to provide a "just and fair settlement" of native land claims is inconsistent with an interpretation of § 14(c)(1) that could reduce the land patented to native corporations in favor of trespassers. *Id.*

In *Hakala,* the court wanted "to protect a wide array of existing legitimate businesses" and thus granted the appellants, Hakala and Kitchen, title to a cabin and its curtilage, from which appellants had conducted guiding operations for over 15 years. *Hakala,* 753 P.2d at 1147, 1148. The *Hakala* case differs from that of Mrs. Capener, however, because in *Hakala* the business did not violate any permit terms. In fact, Kitchen had express authority to conduct this business because he held a permit, issued by the State of Alaska, that gave him the exclusive right to guide customers in the disputed area, as well as a guiding license. The state, by contrast, has never issued any permit, license, or similar right to Mrs. Capener. The state issued a revocable permit to the church, which had the right, at any time, to remove the Capeners and replace them with different missionaries.

Similarly, the appellants Buettner and Hamar in *Buettner v. Kavilco, Inc.,* 860 F.2d 341 (9th Cir.1988), personally obtained revocable special use permits from the United States Forest Service that allowed each appellant to live on Kasaan Island. The Native Corporation of Kavilco then selected this land, later attempting to revoke the permits and enter lease agreements, which the appellants refused. The court found that the appellants "*as permittees* ... were entitled to occupy the land although it was owned by someone else", thus deciding that § 14(c)(1) requires native corporations to convey title to permittees, so long as the permittee fulfills § 14(c)(1)'s occupancy requirements. *Id.* at 343. (Emphasis added). Again, unlike Buettner and Hamar, Mrs. Capener does not hold a permit. Since her entitlement to occupy depended solely on the permittee-church, which could have removed her from the property at any time, she possesses a far weaker interest than did the *Hakala* and *Buettner* appellants.

In determining the issues in this case, it is helpful to examine the Congressional purpose behind the ANCSA. The *Hakala* court stated that Congress intended to give native tribes "title to a portion of the lands which they occupied", noting that Congress was "sensitive to the impoverished condition of natives and the lack of opportunity natives have to improve their condition". *Hakala,* 753 P.2d at 1147 (quoting House Comm. on Interior and Insular Affairs, Alaska Native Claims Settlement Act of 1971, H.R.Rep. No. 523, 92d Cong., 1st Sess., reprinted in 1971 U.S.Code Cong. & Admin.News 2191, 2193, 2196). Defendant's analysis of § 14(c)(1) would undermine this ANCSA purpose, and would contradict the policy that courts construe the ANCSA in favor of natives where the statute contains ambiguous language. *Id.* at 1147.

Additionally, Secretarial Order No. 3016 and accompanying Memorandum, Valid Existing Rights Under the Alaska Native Claims Settlement Act, 85 Interior Dec. 1 (1977), sheds light on the legislative intent behind the ANCSA. The Memo defines the meaning of "valid existing rights" in § 14(g), which provides that:

All conveyances made pursuant to this Act shall be subject to *valid existing rights.* Where, prior to patent of any land or minerals under this Act, a lease, contract, *permit,* right-of-way, or easement (including a lease ...) has been issued for the surface or minerals covered under such patent, the patent shall contain provisions making it subject to the lease, contract, *permit,* right-of-way, or easement, and the right of the lessee, contractee, *permittee,* or grantee to the complete enjoyment of all rights, privileges, and benefits thereby granted to him. Upon issuance of the patent, the patentee shall succeed and become entitled to any and all interests of the state or the United States as lessor, contractor, *permittee,* or grantor, in any such leases, contracts, permits, rights-of-way, or easements covering the estate patent-

ed.... 43 U.S.C. § 1613(g); emphasis added.

The Memo notes that the regulations distinguish between rights "leading to acquisition of title", which the Act intends to exclude from conveyance to natives; and "rights of a temporary nature", which the Act intends to convey, but with the condition that the right be protected "for the duration of the interest". *Id.* at 5, *citing* 43 C.F.R. 2650.3–1(a).

The Memo discusses the problem posed by lands which the state conveyed, leased or patented before the state had received final approval for state selection. It indicates that the position of the recipients of these types of interests should not be worsened by the passage of the ANCSA, saying that "[t]he House Committee report reflects Congress' concern that a lease issued by the State which on its terms was conditional on the issuance of a patent to the State not be terminated by virtue of the Native selection". *Id.* at 6–7, citations omitted.

Mrs. Capener did not hold a license or permit, nor any other vested right or interest that could "lead to the acquisition of title" at the time of the Act's passage. Because Mrs. Capener has no claim which could have ripened into a title interest had ANCSA *not* passed, she cannot now acquire title because the Act *did* pass, particularly considering the Act's purpose of giving title to Alaska Natives. For these reasons, the court GRANTS summary judgment in plaintiff's favor.

In terms of the legal questions presented in this case as defined in part III B, *supra*, the superior court thus gave a negative answer to the second question—whether one who occupies property subject to a revocable permit issued to another is entitled to a 14(c) reconveyance. Concerning the first question—can a permittee under a revocable permit be entitled to a reconveyance—the superior court gave no answer, but discussed *Buettner v. Kavilco, Inc.*, 860 F.2d 341 (9th Cir.1988), which indicates that this question should be answered in the affirmative.

## D. Case law interpretations of section 14(c).

As the superior court's decision points out, we interpreted one aspect of section 14(c)(1) in *Hakala v. Atxam Corp.*, 753 P.2d 1144 (Alaska 1988), and the Ninth Circuit Court of Appeals considered this section in two cases, *Donnelly v. United States*, 850 F.2d 1313 (9th Cir.1988) *cert. denied* by *Lee v. Eklutna, Inc.*, 488 U.S. 1046, 109 S.Ct. 878, 102 L.Ed.2d 1001 & *Donnelly v. Eklutna, Inc.*, 488 U.S. 1046, 109 S.Ct. 878, 102 L.Ed.2d 1001 (1989), and *Buettner v. Kavilco, Inc.*, 860 F.2d 341 (9th Cir.1988).

In *Hakala*, a guide, Kitchen, and his transferee made a 14(c)(1) claim against a village corporation to a small cabin which Kitchen had erected on public lands. *Hakala*, 753 P.2d at 1145. The cabin served as the base camp for Kitchen's bear hunting operations. *Id.* The main controversy in the case, which we resolved in favor of Kitchen, was whether the cabin was "a primary place of business" under 14(c)(1). *Id.* at 1146–49. Holding that Kitchen was entitled to a section 14(c)(1) reconveyance of the cabin site and surrounding curtilage we stated:

> We do not ... believe that Congress intended under ANCSA to convey lands to native corporations to the exclusion of those who had previously utilized the lands in an established, legal and routine fashion. Otherwise, we can find no reason for Congress to have included the reconveyance clause in § 14(c)(1). Thus, we believe that in § 14(c)(1), Congress intended to protect the existing rights of those using lands which would later become subject to an interim conveyance under ANCSA. Accordingly, we adopt an interpretation of the phrase "a primary place of business" which effectuates Congress' intent to protect the wide array of existing legitimate businesses.

*Id.* at 1147. In reaching this conclusion, we adopted Kitchen's "common-sensical interpretation" of the statutory term "a primary place of business." *Id.*

Although the trial court in the present case stressed that Kitchen had an exclusive guiding permit from the State of Alaska, such a permit would not have given Kitchen a right

to build a cabin on federal public land. Thus, in *Hakala,* the village corporation argued that Kitchen was a trespasser on the critical date in 1971.[7] Kitchen did not contest this assertion. Our opinion in *Hakala* neither resolved nor discussed the question whether Kitchen initially built his cabin on public land without a permit.

*Donnelly v. United States,* 850 F.2d 1313 (9th Cir.1988), involved the case of homesteaders, the Donnellys, who located part of their homestead on public lands which had been withdrawn from entry for a possible power development project. *Id.* at 1315. The Donnellys' entry took place some time in the 1950's. In 1975 the United States filed a trespass action against the Donnellys, who counterclaimed under the Quiet Title Act, 28 U.S.C. 2409a. *Id.* at 1316. In 1979 the United States patented the disputed land to a village corporation against which the Donnellys filed a third-party claim under section 14(c)(1) of ANCSA. *Id.* The United States' trespass action was dismissed. *Id.* The district court then decided the case in favor of the United States and the village corporation. *Id.* On appeal, the Ninth Circuit affirmed, holding: (1) that the twelve-year statute of limitations under the Quiet Title Act barred the Donnellys' claim against the United States; and (2) the Donnellys' 14(c) claim against the village corporation lacked merit because they were trespassers:

> As the district court noted, § 14(c)(1) could not operate as "a sort of amnesty provision extending rights to individuals who are merely trespassers, failed homesteaders, or land users without any vested rights prior to December 1, 1971," because there was no indication of congressional intent to override the established principle that individuals could obtain no rights to withdrawn lands. Moreover, the congressional intent to provide a "just and fair

settlement" of native land claims is inconsistent with an interpretation of § 14(c)(1) that would reduce the land patented to native corporations in favor of trespassers.

*Id.* at 1320 (citation omitted). On rehearing a footnote was added recognizing that *Hakala* represented contrary authority:

> Counsel for appellant has called to the attention of the court a decision of the Supreme Court of Alaska, *Hakala and Kitchen v. Atxam Corp.,* 753 P.2d 1144 (1988), decided after the filing of the decision in this case, that reaches a contrary result.

*Id.* at 1320–21, n. 9.

The *Donnelly* court went on to discuss the Donnellys' contention that they were not trespassers as they had equitable title to the land. *Id.* at 1321. The court refused to resolve this issue, holding that it was dependent on the quiet title claim which was barred by the Quiet Title Act statute of limitations. *Id.*

*Buettner v. Kavilco, Inc.,* 860 F.2d 341 (9th Cir.1988), involved the holders of two long-term revocable Forest Service permits who built residential cabins on the land. Ultimately, the land was patented to a village corporation which sought to increase the permittees' rent. *Id.* at 342. When the permittees refused to pay the increased rent, the village corporation sought to eject them. *Id.* The permittees countered by bringing a quiet title action which was resolved by the federal district court in favor of the village corporation. *Id.* On appeal the Ninth Circuit reversed, rejecting the village corporation's argument that the permittees were bound by the terms of the permit under section 14(g) of the act.[8] *Id.* at 343. The Ninth Circuit held that the existence of the permits did not bar the permittees from being entitled to reconveyances under section 14(c)(1):

---

7. "Mr. Kitchen in 1971 had no right whatsoever to be there. No law or permit authorized him to build a structure there. He did not have a special guiding permit for the area until 1973.... The land may have been open to hunting and backpacking, but Mr. Kitchen was trespassing when he placed his ... shack there." *See* Ae.Br. 14 *Hakala v. Atxam Corp.,* Supreme Court No. S–1866.

8. As noted *supra,* p. 1061, section 14(g) makes conveyances to Native corporations subject to the terms of outstanding leases, contracts and permits. "Upon issuance of the patent, the [Native corporation] shall succeed and become entitled to any and all interests of the ... United States as lessor, contractor, permitter ... in any such leases, contracts, permits...." ANCSA 14(g), 43 U.S.C. § 1613(g).

We discern no inconsistency between this plain reading of section [14(c)(1) ] and the provisions of section [14(g) ]. The latter section applies to lessees, contractees, permittees, and grantees of rights-of-way and easements. It is true that a person with rights under section [14(g) ] might also have rights under section [14(c)(1) ]. On the other hand, persons having rights under section [14(g) ] will not necessarily come within the scope of section [14(c)(1) ]. For example, United States Forest Service special use permit-holders who did not occupy their sites as a primary residence on December 18, 1971, would be protected only by section [14(g) ].

*Id.* at 343. In reaching this conclusion, the Ninth Circuit noted that its interpretation of 14(c)(1) was in accordance with the interpretation given that section by this court in *Hakala. Id.*

### E. Purpose of section 14(c).

In determining the meaning of a statute, we begin with an examination of the language employed construed in light of the purpose of the statute. *Beck v. State, Dept. of Transp. & Public Facilities,* 837 P.2d 105, 117 (Alaska 1992). The purpose of legislation can often be understood by considering the problem which the legislation was designed to address.

The overall objective of ANCSA is clear. It is the prompt and "just settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims...." ANCSA § 2, 43 U.S.C. 1601(a). In an enactment of the magnitude of ANCSA, however, there are many subsidiary, more specific purposes. The specific purpose of section 14(c) may be ascertained by an examination of the problem that section was intended to address.

The central problem was that in most of Alaska's villages, individual Natives did not own the land on which their houses were located. More generally, the non-ownership problem also applied to non-Natives in the

villages and to business and subsistence sites. The influential report to Congress of the Federal Field Committee for Development Planning in Alaska, Alaska Natives and the Land (U.S. Govt. Anchorage, 1968) (hereafter Alaska Natives and the Land) made this clear:

Another characteristic of village Alaska is that most of its people live not on land they own, but on the public domain. Two thirds of Alaska's 7,500 village families own no land at all.

Village Alaskans own in fee less than 500 acres of 375 million acres of their Native land. These parcels of land are held by about 1,400 families who have received or petitioned for unrestricted title to their townsite lots.

Under restricted title, somewhat more than 15,000 acres are held by 961 households. Most of this acreage is in 175 allotments—obtained by Natives in the 62 years since the Indian Allotment Act was enacted; the remainder is in 786 townsite lots in 32 villages.

Very little acreage—in townsite lots or allotments—is in northern and western Alaska, where most Alaska Natives live.

. . . .

Without title and without tenure, the vast majority of the rural people live on, range over, and use the public domain as they have for generations.[9]

Alaska Natives and the Land, *supra* p. 21 at 45–46 (footnotes omitted).

In another section the report again observed that the Alaska Native Allotment Act of 1906 and the Townsite Act of 1926 had largely failed to distribute needed land to individual Natives:

Specific land legislation passed for Alaska Natives—the Alaska Native Allotment Act of 1906 and the Townsite Act of 1926—has failed to meet the land needs of the Native people. In the 62 years since passage of the Native Allotment Act only slightly more . than 15,000 acres of land

---

9. The chairman of the Federal Field Committee, Joe Fitzgerald, amplified this theme in his testimony before Congress. Fitzgerald stated that thousands of Alaskans were "squatters" on federal land without claim to title. Statement of Joe Fitzgerald, Hearing on S. 1830 91st Cong., 1st Sess. 119, 121 (1969).

have been deeded, by restricted deed, to 175 Native allottees. And in the 42 years since the passage of the Townsite Act, only 28 Native villages have been surveyed with deeds issued to their inhabitants; and title in fee simple to less than 500 acres has been conveyed.[10]

*Id.* at 537. The report noted that lack of ownership contributed to the problem of inadequate housing:

> While the low cash income of villagers is an important reason behind substandard dwellings in village Alaska, it is not the sole explanation. Federal programs of insured loans are not available, even to those with ability to repay, if they do not possess title to the land upon which a house is to be situated, and most Alaska villagers are landless.

*Id.* at 73. Discussing the economic consequences of a land claims settlement, the report stated:

> The absence of title to land occupied by Natives in Alaska villages is clearly an obstacle to financing homes, businesses, and community facilities. The grant of title to these lands would just as clearly have a beneficial effect on the village economy. . . .
>
> Grants of land title for homesites, businesses, community facilities, and special-purpose locations such as fish camps and burial grounds should not be expected to have any negative effects on general economic development. Some question might be raised about sites in existing withdrawals such as national forests. The total area of land involved is so small, however, that we can find no instance in which such transfers would subvert the purposes of the original withdrawal.

*Id.* at 529.

Addressing the problem of lack of individual, as distinct from collective, village land ownership is then the primary purpose of section 14(c)(1) and (2) of the Act. Arnold, *supra* note 1, at 250–51, describes the process of individual conveyancing under the Act as follows:

Although most of the land that is conveyed to Natives under the settlement act goes to corporations they own, perhaps 10,000 Natives are entitled by the act to become property owners as individuals. There are three ways in which this can take place: (1) by reconveyance by a village; (2) by individual application from those living at isolated locations; and (3) by obtaining an allotment filed for prior to passage of the act.

. . . .

Most Natives who become individual landowners will receive their land by reconveyance from their village corporations.

Once village corporations receive title (patent or interim conveyance) to lands they have selected, they are, among other things, to reconvey parcels of land to individual occupants of such parcels. Specifically, they are required to give surface title at no cost to Natives and non-Natives who are using such parcels as:

· a primary place of residence;

· a primary place of business;

· a subsistence campsite, or

· a headquarters for reindeer husbandry.

Although there were about 49,000 Natives who considered their place of residence to be one of the 203 village corporations, it is not clear that all of them will receive tracts of village land. . . .

Persons who receive land from their village corporations may immediately sell or lease it. There is no restriction (as there is with stock ownership) against the sale of land. Individually held lands are subject to property taxes if they are developed or leased. . . .

Individuals receiving title do not obtain the subsurface estate. Except for the wildlife refuges and Naval Petroleum Reserve No. 4, the subsurface belongs to the regional corporation. . . .

Transfer of title to individuals is but one task of reconveyance imposed on a village corporation. It is also required to convey surface title to nonprofit organizations (such as churches) for tracts they occupy,

---

**10.** The report specifically mentioned that the Village of St. Paul was surveyed but no deeds to individuals had been issued. Alaska Natives and the Land, at 492.

either without cost to the organization or for what the land was worth when it was first occupied. It must also convey to the municipal, state, or federal governments surface title to lands where airports or air navigation aids are located. And it must convey to its municipal government no less than 1,280 acres of the remaining improved lands in the village; if there is no city government, this acreage is to be conveyed to the State where it would be held in trust.

Another text, David S. Case, *Alaska Natives and American Laws* (1984), recognizes that the primary purpose of section 14(c) is to convey land in settled areas to individual occupants. It states that in this respect 14(c) was intended to serve the same purpose as the townsite laws which were previously applicable to Alaska.[11]

Section 14(c) of ANCSA appears to be an alternative to the subsequently repealed Alaska townsite laws. As now amended, it requires each village corporation to deed to local residents, businesses and non-profit organizations the surface estate of those village lands they occupied as of December 18, 1971. As originally enacted, a minimum of 1,280 acres of the remaining surface estate also had to be conveyed to the incorporated municipality or to the state in trust for any future municipality, but 1980 amendments to ANCSA now permit village corporations to negotiate lower municipal grants with the state or affected municipalities.

. . . .

Congress repealed [the 1926 Alaska Native Townsite Act] because ANCSA had made it "obsolete". . . .

*Id.* at 167–168 (footnote omitted).

### F. "Occupant" as defined by the dictionary and townsite act case law.

Webster's Third New International Dictionary offers the following definitions of the term "occupant":

**1 a:** one who takes the first possession of something that has no owner and thereby acquires title by occupancy **b:** one who takes possession under title, lease or tenancy at will **2 a:** one who occupies a particular place or premises: TENANT, RESIDENT ... **b:** one who holds a particular post **3:** one who has the actual use or possession of something <limped hurriedly to grab a table whose ~s had scarcely risen fully to their feet ...>

Only definitions 1a, 1b and 2a could be applicable to the present problem as the others do not refer to the occupancy of real estate. Of these, application of 1a is to be doubted since there is no suggestion that Congress intended the benefit of 14(c)(1) to be limited to the first occupant of a dwelling in a village as distinct from subsequent occupants. The distinction between 1b and 2a seems to be that under 1b there is a connotation that an occupant must have a legal status whereas under 2a one may be an occupant merely by virtue of residence.

Under either definition 1b or 2a Capener qualifies as an occupant. Thus if the dictionary alone were to be our guide both of the legal questions involving the meaning of "occupant" posed by this case—can a holder of a revocable permit be an occupant and can one who occupies property which is subject to a revocable permit issued to another be an occupant—would require unqualified affirmative answers. However, the townsite act cases offer further guidance in defining the term occupant.

As noted, section 14(c) is meant to address the same general purpose as the townsite laws previously governing Alaska. *See* Case, *supra,* p. 25 at 167–68. These, in turn, had their counterparts in laws governing the settlement of the western states. *See Oswald v. Columbia Lumber Co.,* 425 P.2d 240, 241 n. 1 (Alaska 1967); *see also Aleknagik Natives, Ltd. v. United States,* 635 F.Supp. 1477, 1479 (D.Alaska 1985) (recognizing extension of federal townsite laws to Alaska pursuant to Townsite Act of March 3, 1891, 26 Stat. 1099,

11. These statutes were the 1891 Townsite Act, formerly codified at 43 U.S.C. § 732 (1970), and the Alaska Native Townsite Act of 1926, formerly codified at 43 U.S.C. § 733 *et. seq.* (1970). They,

like townsite laws applicable elsewhere in the United States, operated to convey the public domain to occupants for either no cost or a prorated portion of survey fees. Case, *supra,* 158.

43 U.S.C. § 732 (repealed 1976)). Generally, under these laws the "occupant" of premises on the legally relevant date was entitled to a conveyance, usually on payment of survey costs. *See e.g.,* Townsite Act of 1867, 43 U.S.C. § 718 (repealed 1976); *Oswald,* 425 P.2d at 242; *Johnston v. Smith,* 39 Ariz. 337, 339, 6 P.2d 891, 893 (1931); *Singer Mfg. Co. v. Tillman,* 3 Ariz. 122, 21 P. 818 (1889); *Clark v. Titus,* 2 Ariz. 147, 11 P. 312 (1886); *Amador County v. Gilbert,* 133 Cal. 51, 65 P. 130 (1901); *City of Pueblo v. Budd,* 19 Colo. 579, 36 P. 599 (1894); *City of Helena v. Albertose,* 8 Mont. 499, 20 P. 817 (1889); *Hall v. North Ogden City,* 109 Utah 325, 175 P.2d 703 (1946); *Holland v. Buchanan,* 19 Utah 11, 56 P. 561 (1899); *Lockwitz v. Larson,* 16 Utah 275, 52 P. 279 (1898); *Pratt v. Young,* 1 Utah 347 (Utah 1876) *aff'd Cannon v. Pratt,* 99 U.S. 619, 25 L.Ed. 446 (1878). In view of the similarity of purpose between section 14(c) and the townsite laws, the meaning of "occupant" as used in these laws may be a valuable guide.[12]

The Supreme Court of Arizona in *Singer Manufacturing Co. v. Tillman,* 3 Ariz. 122, 21 P. 818 (1889), laid out the definition of "occupant" and the rules defining "occupancy" for the purpose of the townsite act governing Arizona:

> An "occupant," within the meaning of the townsite law of congress, is one who is a settler or resident of the town, and in the *bona fide,* actual possession of the lot at the time the entry [13] is made. One who has never been in the actual possession of a lot cannot be said to be an "occupant" thereof. The occupancy referred to must be actual, and cannot be begun by agency, no one being allowed to take up lots by his agent. The occupancy may be for resi-

dence, for business, or for use, but the residence, business, or use must be by the claimant. A party having a *bona fide* occupancy can afterward lease the ground and still retain his right thereto, and he may sell his claim, except that no contract, either for the sale or lease, which conflicts with the requirements that the title shall be made to an inhabitant who is an occupant and has an interest, will be recognized in deciding to whom the government title shall go; and a party purchasing an interest in such property can have government title to the extent of such interest, provided he becomes an occupant, thus showing no one is entitled to or can receive government titles to a town lot unless he is in the actual, *bona fide* possession and occupancy of the lot.

3 Ariz. 122, 122, 21 P. 818, 818 (1889) (citations omitted.) *See also Cain Heirs v. Young,* 1 Utah 361, 364 (1876), *rev'd on other grounds, Stringfellow v. Cain,* 99 U.S. 610, 25 L.Ed. 421 (1878); *Pratt v. Young,* 1 Utah 347, 352–54 (1876) *aff'd Cannon v. Pratt,* 99 U.S. 619, 25 L.Ed. 446 (1878).

The townsite act cases interpreting the term "occupant" assume that an occupant who is merely a tenant does not qualify for a conveyance. The occupant must have a colorable claim to equitable ownership of the improvements. *Singer Mfg. Co. v. Tillman,* 3 Ariz. at 122, 21 P. at 818. However, the actual occupier at the legally relevant date is presumed to be entitled to a conveyance. *Pratt v. Young,* 1 Utah at 353, 356.

Further, the rules concerning whether an occupier had an interest sufficient to entitle the occupier to a deed as an occupant were not strict or technical.[14] Thus, in *Singer*

---

12. The analogy between section 14(c) and the townsite acts carries through subsection (3) of 14(c) which requires that improved land in a village which is not conveyed under subsections (1) or (2) shall be conveyed to the village municipal corporation or to the state in trust for any municipal corporation established in the village in the future. Under the various townsite acts, surveyed lots which had no occupants were either auctioned and the proceeds were paid to the municipal corporation or held in trust for the benefit of the municipal corporation. *See e.g., Pratt v. Young,* 1 Utah 347, 358 (Utah 1876).

13. "Entry" in terms of the townsite laws refers not to the entry by the occupant or the occupant's predecessor but to the entry by the official having the power to issue deeds. It is a term of art which fixes the relevant occupancy date, but has nothing to do with physical entry by the public official.

14. *Pratt v. Young,* 1 Utah at 352. Speaking of the interests of the occupant prior to "entry" by the authorized official, the trial court wrote:

> This limited interest in the land is the creature of the acts of Congress; it is novel and anoma-

*Manufacturing Co. v. Tillman,* Tillman initially was merely a tenant of the landlord, Mund. 3 Ariz. at 122, 21 P. at 818. Mund then gave a mortgage to third parties. Tillman did not pay rent and asked Mund to make repairs to the premises. *Id.* Mund refused, saying he wanted nothing further to do with the premises. *Id.* At this point, in the court's view, Tillman became an occupant in his own right. Shortly thereafter,[15] entry for the purposes of the townsite act was made by the probate judge who deeded the property to Tillman as the occupant. Subsequently, the mortgagees foreclosed. The court found in favor of Tillman since the mortgagor's (Mund's) right was extinguished before he executed the mortgage by his failure to remain in physical occupancy.

In *Pratt v. Young,* Orson and Sarah Pratt were the initial occupants of a house in Salt Lake City. 1 Utah at 355, 359. In 1861 they moved and sold the house to Young and certain members of Young's family occupied it. *Id.* at 359. In 1868 Sarah Pratt resumed possession of the house. *Id.* at 355–56, 359–60. The entry date establishing the relevant date of occupancy occurred subsequent to Sarah Pratt's resumption of possession. *Id.* at 355. In a contest between Sarah Pratt and Young as to who was entitled to a deed to the house under the townsite act, Sarah Pratt prevailed. *Id.* at 360. She had been given possession of the house by Young "without any contract for rent or any understanding or agreement expressed or implied, that she should become or be the tenant of [Young]...." *Id.* at 359–60. Several other cases recognize that an occupant need not

comply with technical legal requirements in order to establish his or her interest in the land. *See, e.g., Hall v. North Ogden City,* 109 Utah 325, 175 P.2d 703, 708–711 (1946) (discussing several cases where occupancy was sufficient to give party title to land). *See also Ashby v. Hall,* 119 U.S. 526, 7 S.Ct. 308, 30 L.Ed. 469 (1886) (occupant's right to land established upon entry of townsite and nothing more was necessary).

### G. The meaning of "occupant" under section 14(c).

 Having reviewed the language and purpose of section 14(c) and the relevant case law, we are in a position to interpret the meaning of the term "occupant." The dictionary definition, "one who occupies a particular place or premise" captures the intended meaning accurately for most cases.[16] However, for situations involving tenancies or similar relationships this definition is inadequate. It would require a reconveyance to an occupier who is merely a tenant of the owner of the improvements. Such a person's property interest is not strong. Further, in some cases this would be unjust to the owner of the improvements, as where the owner holds under a long-term government lease and would be protected for the term of the lease under section 14(g), while the tenant, whose sole residence is on the premises, would have a claim to title under section 14(c)(1). Moreover, case law construing the term "occupant" in the analogous townsite act context seems to be clear that one who is merely a tenant is not an occupant.

lous, and only subject to the ordinary rules of law governing real estate (if at all) in a narrow and subordinate sense. The fee simple which is usually the largest possible estate which a man can have in and which draws to it all of the incidents of such an estate such as possession or the right of possession, and is the predicate of the relations of the landlord and tenant, does not enter into or constitute any part of the statutory interest in land which is created by the acts of Congress. On the contrary the fee is recognized as being in another, and this estate or interest in the land exists in its narrow and meagre entirety, without and independent of it.

To apply to it the rules and analogies which ordinarily govern and guide in determining interests and relations in regard to real estate,

would be in contravention of the very nature of the right itself. The title to real estate is now in abeyance. This statutory interest vanishes upon the mere abandonment of the possession of the land. The title to real estate can only be transferred from one person to another by writing in proper form and duly attested. This interest can pass from one to another by the surrender of possession of the land. *Id.*

15. Tillman's occupancy began in February of 1882 and he received his deed as an occupant in April of 1883.

16. We thus reject the definition of "occupant" which implies that an occupier must have a particular legal status. *See supra* p. 1070.

It is necessary therefore in tenancy cases to add to the dictionary definition a requirement that the occupier have an equitable interest in the improvements. The definition in such cases thus would be "one who occupies a particular place or premise and has an equitable interest in the improvements thereon."[17] As in the townsite act cases, there should be a rebuttable presumption that the occupier on the critical date is the occupant and thus entitled to a conveyance assuming that the occupancy purpose requirements are met. In determining whether an occupier has the requisite equitable interest, technical or strict property concepts need not be adhered to. This approach is employed in the cases interpreting the townsite acts. *See, e.g., Singer Mfg. Co.,* 3 Ariz. 122, 21 P. 818; *Pratt,* 1 Utah at 353 (quoted *supra* in note 14). It seems especially appropriate to section 14(c), since 14(c)'s purpose is to distribute individual titles to residents of Alaska villages where concepts of American property law have been little used.

■ We are mindful of the rule of construction that ambiguous laws affecting Natives should be construed in favor of Natives. *Hakala,* 753 P.2d at 1147. This rule should not be applied in favor of TDX in this case for a number of reasons. First, TDX offers no interpretation of section 14(c) which is reasonably consistent with the language of that section, or its purpose. Second, the central purpose of 14(c) was to effect the transfer of title to thousands of Alaska Natives individually. A narrow construction of 14(c) would serve to thwart rather than further that purpose.[18] Third, as section 14(c) is structured, questions of entitlement as to improved land in and around Native villages involve as competing claimants not individual occupants and village corporations, but individual occupants and municipal corporations (or the State of Alaska in trust for future municipal corporations). Under section

14(c)(3), improved land in and around Native villages which is not transferred to individual occupants under (c)(1) or (2) is to be conveyed to the municipal corporation for the village or, if there is none, to the state in trust for a future municipal corporation.

### H. A permittee may be an "occupant."

■ We return to the first question raised by the parties' arguments: whether a permittee holding under a revocable permit may be entitled to a section 14(c) conveyance or whether the permittee's rights are limited by the terms of the permit. Our answer is that the permittee may be entitled to a 14(c) conveyance.

The permittee must be an occupant within the meaning of section 14(c)—an occupier with an equitable interest in the improvements—and the purpose of the permittee's occupancy must be one of the purposes recognized by section 14(c)(1) or (2). The Act does not impose as an additional requirement a condition that an occupant not hold under a government lease or permit. Indeed, since the Act mandates conveyances to non-Native residential occupants whose rights are based solely on the fact that they occupy dwellings built on the public domain without a permit, it would be paradoxical to deny a conveyance to residential occupants who have made permitted entries.[19] We conclude therefore that a permittee may be an occupant. The fact that the permittee may also have rights under the permit which are preserved under section 14(g) does not preclude the permittee from receiving a conveyance under section 14(c). Our conclusion on this point comports with the Ninth Circuit's decision in *Buettner.*

### I. An occupier of property subject to a revocable permit issued to another may be an "occupant."

■ The second question raised by the parties' arguments is whether a person who

---

**17.** With respect to subsistence campsites and headquarters for reindeer husbandry, improvements may be either non-existent or relatively unimportant. We do not, therefore, intimate any view as to the application of this definition to occupancy for such purposes.

**18.** In *United States v. Atlantic Richfield Co.,* 612 F.2d 1132, 1139 (9th Cir.1980), the court observed that the rule of construction favoring Na-

tives is only a guideline, not a principle of substantive law, and "should not be used to defeat the manifest intent of Congress."

**19.** In *Buettner* the court stated: "It would be an odd statute indeed which conferred rights to obtain a deed on persons occupying property without permission, but which denied these rights to lawful occupants." *Buettner v. Kavilco, Inc.,* 860 F.2d at 343.

occupies property which is subject to a revocable permit issued to another may be entitled to a section 14(c) conveyance. Our answer is that such an occupier may be entitled to a conveyance, if the occupier has an equitable ownership interest in the improvements, and meets the occupancy purpose requirements of the Act. The Act does not impose additional requirements. We have concluded above that the existence of a permit is irrelevant to eligibility for a 14(c) conveyance and that the terms of an existing permit do not bar a conveyance. It follows that the fact that a permit may have been issued in the name of a non-occupant should not preclude a conveyance to an occupant who meets section 14(c) requirements.

### J. The right to a reconveyance can be transferred subsequent to the legal occupancy date.

 The third legal question raised by the parties' arguments is whether an occupant entitled to a 14(c) reconveyance from a village corporation may transfer the occupant's right to a reconveyance to a third party. The answer to this question clearly is affirmative.

An occupant's right to a 14(c) reconveyance is an individual property right which vests on what the Ninth Circuit has called the "magic" date. *Buettner*, 860 F.2d at 343. Property interests are alienable in the absence of specific prohibitions on alienability. *See* Roger A. Cunningham, et al., *The Law of Property* § 2.1, at 29 (2d. ed. 1993). No such prohibitions exist in ANCSA. Moreover, under the townsite acts an occupant could transfer his interest subsequent to the legal occupancy date and prior to receipt of the deed. *McKennon v. Winn*, 1 Okl. 327, 33 P. 582, 585 (1893). TDX's argument that the permit terms prohibit the Home Missions

Department from making a conveyance to Capener after the legal occupancy date lacks merit, for just as the inconsistent terms of the permit do not control an occupant's right to a conveyance they do not deprive the occupant of the power to transfer that right.

### K. Genuine issues of material fact exist which preclude summary judgment.

 An affirmative burden falls on one who seeks summary judgment to establish the absence of genuine issues of material fact. *Wickwire v. McFadden*, 576 P.2d 986, 987 (Alaska 1978); *Clabaugh v. Bottcher*, 545 P.2d 172, 175 n. 5 (Alaska 1976). Our resolution of the legal questions raised by the parties' arguments makes it apparent that Capener's right to a conveyance depends on the resolution of certain fact questions including, at least, the following:

1. Did Capener have an equitable interest in the improvements on Lot 3 on January 19, 1979? If so, is Lot 2 part of the curtilage of the house and business on Lot 3?

2. Did the local church organization have an equitable interest in the improvements on Lot 1 or Lot 3 on December 18, 1971?

3. Did the Home Missions Department transfer its interest in the property to Capener prior to executing the general disclaimer.[20]

As TDX has not negated the existence of genuine issues concerning these questions, summary judgment was improper. The judgment of the superior court must therefore be reversed and this case remanded for further proceedings.[21]

REVERSED and REMANDED.

---

**20.** TDX's argument that the statute of frauds, AS 09.25.010, precludes an oral conveyance of a real estate interest is not unconditionally correct. There are exceptions to the oral conveyance bar, one of which is where the party sought to be charged with the conveyance subsequently acknowledges it. AS 09.25.020(4). An excerpt of the deposition of one of the Home Missions Department officials, Bransford, indicates that he agrees that the conversation on which Capener bases her conveyance argument took place. However, both the content of the conversation

and the intent of the parties require more development.

**21.** Capener makes three other arguments which we reject summarily. The first is that the seven-year color of title adverse possession statute bars TDX's claim. This lacks merit as Capener did not have color of title as that term is used in the adverse possession statute:

> Color of title exists only by virtue of a written instrument which purports to pass title to

COMPTON, Justice, dissenting.

I am unpersuaded by this court's analysis of Section 14 of the Alaska Native Claims Settlement Act (ANCSA). Further, I conclude that the superior court reached the correct result. Therefore I dissent.

The Assemblies of God's entitlement to occupy and use the land was based on a Special Use Permit issued to it by the United States Department of the Interior, Fish and Wildlife Service, Bureau of Commercial Fisheries. The permit gave the Assemblies of God "the right to occupy and use [the land] for the purpose of constructing, establishing, creating, and maintaining a church and parsonage, ... and for no other purpose whatsoever." The permit had a ten year primary term, with automatic annual renewals unless terminated by either party by thirty days written notice. Upon expiration or termination of the permit, the Assemblies of God had the right, upon fulfillment of certain terms and conditions, to remove all structures, except those furnished by the government. If it failed to do so, any structures became property of the United States. The permit was not transferable, and no interest could accrue to a third person without permission of the Director of the Bureau of Commercial Fisheries. The only rights and liabilities created by the permit were between the United States Government and the Assemblies of God.

Lillian Capener and the late Reverend A.E. Capener were never permittees under the Special Use Permit. They did not "enter[ ] the land under the auspices of a special use permit...." They entered the land under the auspices of the Assemblies of God. The Capeners' presence on the land was as missionaries for the Assemblies of God.[1] By virtue of their mission, they had permission to use the parsonage.[2] On the "magic" dates the Assemblies of God had not terminated the Special Use Permit, nor had it divested the Capeners of their mission.

The court acknowledges that the term "occupant" is ambiguous. The fact that the court goes to such great lengths to craft its definition of "occupant" demonstrates this clearly. However, in my view the court not only crafts an incorrect definition, but also misapplies it even if correct.

I. The Court's Definition of "Occupant" Is Unpersuasive.

The court concludes that an "occupant" is "one who occupies a particular place or

---

the claimant, but which is ineffective because of a defect in the means of conveyance or because the grantor did not actually own the land he sought to convey.
*Hubbard v. Curtiss,* 684 P.2d 842, 847 (Alaska 1984). Second, Capener claims that laches bars TDX's claim, as in the period between patent to TDX and suit against Capener her husband died, thus requiring this case to be resolved without his testimony. Capener fails to adequately address this argument in her brief; therefore, we will not consider it on appeal. *Lewis v. State,* 469 P.2d 689, 691–92 n. 2 (Alaska 1970). Third, Capener argues that TDX has implicitly acknowledged her occupancy right since it has not reconveyed the land to the City of St. Paul. This does not follow logically, since there are a number of alternative reasons which can explain TDX's failure to reconvey to the municipality. In any case, this argument was not raised below and therefore will not be considered on appeal. *Arnett v. Baskous,* 856 P.2d 790, 791 n. 1 (Alaska 1993) (points not raised in the trial court will not be considered on appeal).

**1.** A.E. Capener was an ordained missionary of the Assemblies of God. Mrs. Capener was and is a nationally appointed home missionary of the Assemblies of God, in good standing. A recent article in the Anchorage Daily News presents the more human side of the Capeners' life and the Assemblies of God mission on St. Paul Island. T.A. Badger, *50 Years a Missionary in Tough Alaska Country,* Anchorage Daily News, August 29, 1994, at B–1. The article has no evidentiary value, though I found it instructive in that the Alaska Director of the Assemblies of God opined that the St. Paul mission probably would not be continued after Mrs. Capener's tenure.

**2.** The court continually refers to the Assemblies of God parsonage as the Capeners' "house." Webster's Second New International Dictionary defines parsonage as follows:

1. Eng.Eccl.Law. A certain portion of lands, tithes, and offerings, for the maintenance of the parson of a parish. 2. The glebe and house, or house only, appropriated by a parish or ecclesiastical society to the maintenance or use of the incumbent or settled pastor or minister. 3. The tithe belonging to a parson. Scot.

It is clear that the parsonage constructed on Lot 3 was "appropriated by [an] ecclesiastical society to the maintenance of the incumbent or settled pastor or minister." The parsonage did not exist separate from the Capeners' mission.

premises and has an equitable interest in the improvements thereon."[3] The first half of the definition is simply a self evident dictionary definition. The second half presumably distinguishes one kind of tenant from another kind of tenant.[4] However, the appended language does not appear to correct the problem the distinction allegedly addresses. The court remarks that the dictionary definition

would require a reconveyance to an occupier who is merely a tenant of the owner of the improvements.... [I]n some cases this would be unjust to the owner of the improvements, as where the owner holds under a long-term lease and would be protected for the term of the lease under section 14(g), while the tenant, whose sole residence is on the premises, would have a claim to title under 14(c)(1).... [I]n the analogous townsite context [it] seems to be clear that one who is merely a tenant is not an occupant.

. . . . .

It is necessary therefore in tenancy cases to add to the dictionary definition a requirement that the occupier have an equitable interest in the improvements.

Opinion at 1072–1073. The language appended by the court merely narrows the category of tenants who will divest their landlords; it does not eliminate the problem. Under the definition crafted by the court, the tenant (sub-lessee) of the holder of a long-term government lease (sub-lessor), who occupies the land as a primary residence or business and who has an equitable interest in improvements put on the premises with the sub-lessor's consent, would become the owner of the property the sub-lessor leased to that tenant.

The definition employed by the court creates an impossible situation. The patent, by which the Village Corporation obtains title from the United States, is subject to the lessee/sub-lessor's "complete enjoyment of all rights, privileges, and benefits thereby granted him [by the lease]." Section 14(g). The

described sub-lessee is entitled to a conveyance of title from the Village Corporation "without consideration." Section 14(c)(1). Thus the sub-lessee's title is subject to the sub-lessor's existing rights, which may include entitlement to rent from the sub-lessee, who is now the owner. Presumably if the sub-lessee defaults in the payment of rent, the lessee/sub-lessor may evict the person who is now the owner of the property.

I am unpersuaded that this attempted differentiation between various kinds of tenants, one of whom obtains title and the other of whom occupies in accordance with the terms of a lease which cannot be transformed into title, justifies the court's definition of "occupant." The definition will exacerbate the problem. A tenant by any other name will still be a tenant. The problem will be the same: the tenant's Section 14(c)(1) rights will conflict with the United States' lessee's Section 14(g) rights.

The court's definition of occupancy is flawed even when viewed only in the context of Section 14(c)(1). As used in Section 14(c)(1), "occupant" applies to four classes of activity on land: (1) primary place of residence, (2) primary place of business, (3) subsistence campsite, or (4) headquarters for reindeer husbandry. Acknowledging the inadequacy of its craftsmanship, the court restricts its definition of occupant to the first two classes of occupants. As it states, in the other categories "improvements may be either non-existent or relatively unimportant." Opinion at 1073 n. 17. While that may be true, on what basis can such a definitional distinction be made between category 1 and 2 occupants on the one hand, and category 3 and 4 occupants on the other? I suggest there is none. Furthermore, given the nomadic culture of many of Alaska's Natives, an equitable interest in improvements is a concept of questionable utility.

II. The Court Improperly Applies Its Own Definition of "Occupant."

The court's definition of occupant requires that the occupier of the premise have an

---

3. The court does not define or identify what constitutes "an equitable interest in the improvements."

4. Although the court recognizes that Section 14(c)(1) is an analogue to the Townsite and Native Townsite Acts, it cites no authority suggesting that those Acts make any similar distinction.

"equitable interest in improvements." Even under this definition, Mrs. Capener would not be entitled to a conveyance of title.

The court correctly notes that a tenant is not an occupant "in the analogous townsite act context." Opinion at 1073. The relationship between the Assemblies of God and Mrs. Capener is consistent with, and most analogous to, the relationship between landlord and tenant. The Assemblies of God and Mrs. Capener could not both occupy the land in the statutory sense. And while a tenant might have a claim to ownership of *improvements* under specific circumstances, the court cites no authority for the proposition that the mere existence of such a claim transforms the tenant into an occupant entitled to a conveyance of title. Furthermore, given the terms of the permit, Mrs. Capener cannot have had an equitable interest in the improvements on the land vis-a-vis the United States. The permit states that any improvements will be forfeited to the United States if not removed by the permittee, the Assemblies of God.

Whether a permit holder ever can receive title under Section 14(c) is a question that is not necessary to decide, as Mrs. Capener was not a permit holder. She was on land permitted to another, at the sufferance of another, with no expectation of ever gaining title. The only "equitable interest in improve-

ments" that may have existed was held by the Assemblies of God.

Mrs. Capener's sponsor, the Assemblies of God, was denied title when it tried to obtain it outside of the context of ANCSA.[5] The Assemblies of God has never pursued any ANCSA claim. It has never asserted a Section 14(g) claim to protect its valid existing rights as permittee. It has never pursued a Section 14(c)(2) claim to "[a] tract occupied ... by a nonprofit organization," although there appears to be no dispute that the Assemblies of God is a nonprofit organization, and that it occupied the land. Yet whatever claim the Assemblies of God may have had, its claim was either as a permittee or as a nonprofit organization which occupied the land.

### III. A More Appropriate Definition of "Occupant."

In determining the meaning of "occupant," we are constrained to follow the rule that ambiguities in ANCSA are to be resolved in favor of Natives. *Hakala v. Atxam Corp.*, 753 P.2d 1144, 1147 (Alaska 1988) (citing *United States v. Atlantic Richfield Co.*, 612 F.2d 1132, 1138–39 (9th Cir.1980); *Alaska Public Easement Defense Fund v. Andrus*, 435 F.Supp. 664, 670 (D.Alaska 1977)). Although the court is "mindful" of the rule, it explicitly declines to follow it.[6] I do not

---

**5.** On September 29, 1969, the Alaska District Council of the Assemblies of God, Inc., filed a petition with the appropriate agency within the United States Department of the Interior to obtain title to the lots in question. The petition was rejected at every administrative level.

The petition was preceded by inquiries made by the Assemblies of God dating back to at least April 1966, regarding purchase of the lots. This was several months prior to the issuance of the Special Use Permit on July 7, 1966. Between issuance of the Special Use Permit and the actual petition to obtain title, the Fur Seal Act of November 2, 1966, P.L. No. 89–702, 80 Stat. 1091, 16 U.S.C. sec. 1155 et seq., became law. It precluded obtaining title under laws which might have enabled the Assemblies of God to do so. By the time administrative appeals were in process, ANCSA had been enacted, and had to be considered. The net result was that the Assemblies of God was never able to obtain title to the lots.

**6.** The court declines to follow the rule because "TDX offers no interpretation of Section 14(c) which is reasonably consistent with the language

of that Section, or its purpose." Nothing in the text of ANCSA or case law interpreting ANCSA suggests that TDX is under a burden to produce an interpretation which resolves the ambiguity. Ambiguities are resolved in favor of Natives. If TDX is under such a burden, and has not satisfied it, then the court's exercise in crafting its own definition is a waste of time. Mrs. Capener should prevail by default. It is noteworthy that the definition of "occupant" ultimately crafted by the court is not one proposed by Mrs. Capener.

Furthermore, the asserted failure of TDX's offer is belied by the court itself in its discussion of various townsite laws, ANCSA's parallelism with them, and Congress' intention that Section 14(c) "address the same general purpose as the townsite laws previously governing Alaska." It is also dispelled by the superior court's carefully reasoned decision. It reasoned, and concluded, *inter alia:*

In its briefing, TDX correctly asserts that only the church possessed a possible § 14(c)(1) claim, a claim which has never been adjudicated and which the church has now disclaimed.

know what the court means by this. If there is no ambiguity, the rule does not apply. If there is an ambiguity, the court must follow the rule. The rule requires that the ambiguity must be resolved in favor of Natives. This should not mean that the Natives must provide the best resolution of the ambiguity, else the rule is meaningless. I suggest that the Natives must advance an interpretation that is reasonable. For the reasons set forth in *supra* note 3, I conclude they have done at least that.

Persons entitled to assert occupancy rights under the Townsite[7] and Native Townsite Acts[8] were not required to have a patent, lease, contract, permit, right-of-way, or easement. In other words, they had no Section 14(g) "valid existing rights." The protection for such users has to come from elsewhere. It comes from Section 14(c). According to David S. Case, *The Special Relationship of Alaska Natives To The Federal Government* (1978),

> The Native Townsite Act was administered in the same way and according to the same regulations as an earlier 1891 Act which granted citizens (usually non-Natives) the right to establish townsites in Alaska.... These procedures made no distinction between Native and non-Native in townsite administration. Prior to 1959, it was possible for both Natives and non-Natives to be deeded lots within the subdivided portion and to occupy land in the unsubdivided portion of the same townsite.... The Townsite Act was repealed in 1976, and Section 14(c) of ANCSA provides an alternative for municipalities to acquire municipal lands. However, the townsites established under the 1926 Act were not eliminated either by ANCSA or the 1976 repeal of the Native Townsite Act.... Non–Natives can continue to establish new occupancy rights under the 1926 Act on the same types of land for which ANCSA supposedly prohibited occupancy rights as of December 18, 1971.

*Id.* at 60 (citations omitted).

ANCSA is a coherent act. Section 22(b) protects existing rights that might eventually

---

Mrs. Capener occupied the land subject to the church's rights, and the church, not Mrs. Capener, received the permit. As TDX points out, the church could have removed the Capeners from the property at any time....

*Donnelly v. United States* ... held that § 14(c)(1) could not be used to give "amnesty" for "trespassers, failed homesteaders, or land users without any vested rights prior to December 1, 1971".... Moreover, the congressional intent to provide a "just and fair settlement" of native land claims is inconsistent with an interpretation of § 14(c)(1) that could reduce the land patented to native corporations in favor of trespassers." ...

The state [sic], by contrast, has never issued any permit, license, or similar right to Mrs. Capener. The state [sic] issued a revocable permit to the church, which had the right, at any time, to remove the Capeners and replace them with different missionaries.

[I]n *Buettner v. Kavilco, Inc.,* ... [t]he court found that the appellants "*as permittees* ... were entitled to occupy the land although it was owned by someone else,*" thus deciding that § 14(c)(1) requires native corporations to convey title to permittees, so long as the permittee fulfills § 14(c)(1)'s occupancy requirements.... Again, ... Mrs. Capener does not hold a permit.

 ....

Secretarial Order No. 3016 and accompanying Memorandum, Valid Existing Rights Under the Alaska Native Claims Settlement Act, ... sheds light on the legislative intent behind the ANCSA.... The Memo notes that the regulations distinguish between rights "leading to the acquisition of title," which the Act intends to exclude from conveyance to natives; and "rights of a temporary nature", which the Act intends to convey, but with the condition that the right be protected "for the duration of the interest"....

 ... Mrs. Capener did not hold a license or permit, nor any other vested right or interest that could "lead to the acquisition of title" at the time of the Act's passage. Because Mrs. Capener has no claim which could have ripened into a title interest had ANCSA *not* passed, she cannot now acquire title because the Act *did* pass, particularly considering the Act's purpose of giving title to Alaska Natives. Order, November 21, 1990, pp. 4–9.

The court may disagree with the superior court's reasoning and conclusion. However, I cannot conclude in good conscience that this interpretation, which TDX successfully presented to the superior court and which it argues to this court, is not reasonably consistent with Section 14(c)(1) or its purpose.

7. Townsite Act of 1891, ch. 561, § 11, 26 Stat. 1095, 1099, *repealed by* Pub.L. No. 94–579, Title VII, § 703(a), 90 Stat. 2743, 2789 (Oct. 21, 1976).

8. Alaska Native Townsite Act of 1926, ch. 379, § 1, 44 Stat. 629, *repealed by* Pub.L. No. 94–579, Title VII, § 703(a), 90 Stat. 2789 (Oct. 21, 1976).

lead to title, such as homesteads and mining claims. Section 14(g) protects the existing rights of those temporarily on the land.[9] Section 14(c) protects the rights of those without "existing rights," such as those who but for ANCSA, and its repeal of the Native Allotment Act,[10] may have had reasonable expectations that entry could be made under the Townsite and Native Townsite Acts, following which they would obtain title.[11]

In my view a more suitable definition of occupant would be a user whose continued use 1) is not protected by another section of ANCSA, and 2) is reasonably expected to continue without interference by the United States. This definition would bring within its ambit persons living in a community which could have gained *de jure* status under the Townsite and Native Townsite Acts, and whose entitlement under those now repealed acts is not clear.

The concept of title to land as we understand it is one grounded in common or civil law. It is not a concept of Native culture.

However, if the Native concept of continued use is kept in mind, the definition is appropriate to the purpose of ANCSA.

Congress' use of the term "occupied" becomes more understandable when considered in the context of its traditional use in Native legislation. The term has typically been applied in the context of Native aboriginal title rights. *See* David S. Case, *Alaska Natives and American Laws* 56–75 (1984) (providing a legal history of the aboriginal title rights of Alaska Natives; "occupy" terminology occurs frequently).[12] A basic tenet of statutory construction is a presumption that words that have acquired special meaning in the law carry that meaning in new legislation. *See* *O'Callaghan v. State*, 826 P.2d 1132, 1134 (Alaska 1992). ANCSA extinguished aboriginal title in Alaska. However, the purpose of Section 14(c) is to protect existing users or occupants. The passage of ANCSA did not change the use occupants made of the land, often the very use that aboriginal title was crafted to encompass.

---

9. Section 14(g) states that

[a]ll conveyances made pursuant to this chapter shall be subject to valid existing rights.... [T]he patent shall contain provisions making it subject to the lease, contract, permit, right-of-way, or easement, and the right of the lessee, contractee, permittee, or grantee to the complete enjoyment of all rights, privileges, and benefits thereby granted to him.

10. Alaska Native Allotment Act of 1906, ch. 2469, 34 Stat. 197, *amended* ch. 891, § 1(a)–(d), 70 Stat. 954, *repealed by* Pub.L. No. 92–203, § 18(a), 85 Stat. 688, 710 (Dec. 18, 1971).

11. I believe that a proper reading of ANCSA compels the conclusion that sections 14(c) and 14(g) are mutually exclusive. The United States Court of Appeals for the Ninth Circuit has held that the two provisions are not mutually exclusive. *Buettner v. Kavilco*, 860 F.2d 341, 343 (9th Cir.1988) ("We hold that permittees such as Buettner and Hamar are within this class [of persons protected under 14(c)]."). A practical application of this makes little sense, however. For instance, assume a user has a long term lease from the United States granting permission to operate a commercial supply business in a community. It is the person's primary place of business. Under the terms of the lease, the person has no expectation of ever gaining title to the leasehold. However, the person does expect lease rights to be honored and protected. ANCSA is enacted. Under section 14(g), these rights are protected. Under section 14(c)(1), the person is entitled to a conveyance of title from the Village Corporation. Granting the person title under 14(c)(1) is a windfall.

We noted in *Hakala* that many of the lands subject to ANCSA are remote lands. 753 P.2d at 1148. Some physical presence is required in order to use the lands. As noted by Justice Rabinowitz in his dissent in *Hakala*, the use of a site for one-tenth of a person's business was sufficient occupancy to constitute a "primary place of business." If a lessee can so easily take under Section 14(c)(1), there little point in protecting existing permits in Section 14(g).

12. Not only does section 4(b) of ANCSA use these terms in the context of aboriginal title, but "use or occupancy" has been a term of art in Alaska Native law for over a hundred years. ANCSA § 4(b) (referring to "claims of aboriginal title in Alaska based on use and occupancy"). *See, e.g.,* Organic Act of May 17, 1884, ch. 53, 23 Stat. 24, § 8 (referring to "the Indians['] ... use or occupation"); *Sutter v. Heckman*, 1 Ak.Rpts. 188 (D.C.Alaska 1901), *aff'd on other grounds*, 119 F. 83 (9th Cir.1902) (construing section 8); *Worthen Lumber Mills v. Alaska Juneau Gold Mining Co.*, 229 F. 966 (9th Cir.1916) (also construing section 8); *Miller v. U.S.*, 159 F.2d 997 (9th Cir. 1947) (noting Congressional recognition of the "occupancy or possession" of Alaskan land by Indians); *Tlingit and Haida Indians of Alaska v. U.S.*, 147 Ct.Cl. 315, 177 F.Supp. 452, 463–64 (1959) (referring to "use and occupancy title of the ... Indians").

Finally, the practical effect of a conveyance from the Village Corporation is important to keep in mind. Unlike the regional corporations, a village's pool of land shrinks every time land is conveyed.[13] This land was not a gift from the government, but rather was payment given in exchange for an arguably legally enforceable right. Given this historic fact, and ANCSA's purpose, the court should not interpret ANCSA "to defeat the manifest intent of Congress." *United States v. Atlantic Richfield Co.,* 612 F.2d 1132, 1139 (9th Cir.1980).

---

**13.** A Native village is a "tribe, band, clan, group, village, community, or association" of twenty-five or more Natives. Section 3(c). Native villages are allowed to form Village Corporations. Land selection is allowed by Village Corporations that have at least twenty-five Native residents, if the village is not modern and urban and a majority of the residents are Natives. Sections 11(b)(2) & (3). The land remaining after other section 14(c) conveyances is conveyed by the Village Corporation to a Municipal Corporation "in the Native village" or to the State to hold in trust for a future Municipal Corporation "established in the Native village." Section 14(c)(3). The Municipal Corporation thus is comprised of all or a part of the Native village. It is simply the body politic as the Village Corporation is the body corporate. When a Municipal Corporation receives less land from the Village Corporation because of Section 14 conveyances, the Native residents effectively are receiving less land.